**ASSET PURCHASE AGREEMENT**

DATED AS OF _____

between

RUSTICK, LLC

and

_____

# TABLE OF CONTENTS

ARTICLE 1. SALE AND PURCHASE ................................................................................. 2
    1.1.    Facility Assets ........................................................................................... 2
    1.2.    Excluded Assets ......................................................................................... 3
    1.3.    Liabilities. ................................................................................................ 4
    1.4.    Purchase Price. ......................................................................................... 5
    1.5.    Adjustments ............................................................................................. 5
    1.6.    Closing ..................................................................................................... 6
    1.7.    Third-Party Consents ............................................................................... 6
ARTICLE 2. REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 7
    2.1.    Status ........................................................................................................ 7
    2.2.    Authority .................................................................................................. 7
    2.3.    No Conflict. .............................................................................................. 7
    2.4.    Permits ..................................................................................................... 7
    2.5.    Approvals and Consents .......................................................................... 7
    2.6.    Facility Assets ......................................................................................... 8
    2.7.    Real Property. .......................................................................................... 8
    2.8.    Environmental Matters.............................................................................. 9
    2.9.    Compliance with Law ............................................................................ 10
    2.10.    Employment Matters.............................................................................. 10
    2.11.    Litigation ............................................................................................... 11
    2.12.    Intangible Property................................................................................. 11
    2.13.    Brokers ...........................................................**Error! Bookmark not defined.**12
    2.14.    Absence of Material Change................................................................... 11
    2.15.    Affiliates ................................................................................................ 12
    2.16.    Disclosure .............................................................................................. 12
ARTICLE 3. REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 12
    3.1.    Status ...................................................................................................... 12
    3.2.    Authority ................................................................................................ 12
    3.3.    No Conflicts ........................................................................................... 12
    3.4.    Brokers................................................................................................... 13
    3.5.    Approvals and Consents ........................................................................ 13
ARTICLE 4. COVENANTS OF SELLER........................................................................ 13
    4.1.    Operation of the Business. ..................................................................... 13
    4.2.    Access to Facilities, Files and Records.................................................. 14
    4.3.    Consents ................................................................................................. 14
    4.4.    Notice of Proceedings ........................................................................... 14
    4.5.    Consummation of Agreement ................................................................ 15
    4.6.    Hart-Scott-Rodino ................................................................................. 15
    4.7.    Confidentiality ....................................................................................... 15
    4.8.    Employee Matters. ................................................................................. 15
ARTICLE 5. COVENANTS OF BUYER ........................................................................ 16
    5.1.    Representations and Warranties............................................................. 16
    5.2.    Consummation of Agreement ................................................................ 16
    5.3.    Notice of Proceedings ........................................................................... 16
    5.4.    Hart-Scott-Rodino................................................................................. 17

873328_3

| 5.5. | Confidentiality | 17 |
|---|---|---|
| ARTICLE 6. AGREEMENT OF SELLER AND BUYER. | | 17 |
| 6.1. | Certain Other Matters | 17 |
| ARTICLE 7. CONDITIONS TO THE OBLIGATIONS OF SELLER | | 17 |
| 7.1. | Representations, Warranties and Covenants. | 17 |
| 7.2. | Proceedings. | 18 |
| 7.3. | DEP Consent | 18 |
| 7.4. | Hart-Scott-Rodino | 18 |
| 7.5. | Deliveries | 18 |
| 7.6. | Bankruptcy Court Approval | 18 |
| ARTICLE 8. CONDITIONS TO THE OBLIGATIONS OF BUYER | | 18 |
| 8.1. | Representations, Warranties and Covenants. | 18 |
| 8.2. | Proceedings. | 19 |
| 8.3. | Hart-Scott-Rodino | 19 |
| 8.4. | Deliveries | 19 |
| 8.5. | Required Consents | 19 |
| 8.6. | Bankruptcy Court Approval | 19 |
| ARTICLE 9. ITEMS TO BE DELIVERED AT THE CLOSING | | 19 |
| 9.1. | Deliveries by Seller | 19 |
| 9.2. | Deliveries by Buyer | 20 |
| ARTICLE 10. MISCELLANEOUS | | 20 |
| 10.1. | Termination | 20 |
| 10.2. | Expenses | 20 |
| 10.3. | Remedies Cumulative | 21 |
| 10.4. | Further Assurances | 21 |
| 10.5. | Public Announcements | 21 |
| 10.6. | Risk of Loss. | 21 |
| ARTICLE 11. DEFINITIONS | | 22 |
| ARTICLE 12. GENERAL PROVISIONS | | 23 |
| 12.1. | Assignability; No Third Party Rights | 23 |
| 12.2. | Amendments; Waivers | 24 |
| 12.3. | Notices | 24 |
| 12.4. | Captions | 24 |
| 12.5. | Governing Law | 24 |
| 12.6. | Entire Agreement | 24 |
| 12.7. | Counterparts | 25 |

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of _____, 2010 between Rustick, LLC, debtor and debtor-in-possession ("Seller") and _____ ("Buyer").

<u>Recitals</u>

A.     Seller owns and operates a solid waste disposal facility in Sergeant Township, McKean County, Pennsylvania and other tangible and intangible assets and properties used or in connection therewith ("Facility") pursuant to certain permits (the "Permits") issued by the Pennsylvania Department of Environmental Protection ("DEP"):

B.     On May 13, 2010, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the U.S. Bankruptcy Court in the Western District of Pennsylvania. Seller continues to manage its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     On July 22, 2010, the Seller filed its Motion for an Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets of Debtor; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief (the "Bid Procedures Motion"), and the Bankruptcy Court entered an Order approving such bid procedures on August 18, 2010 (the "Bid Procedures Order").

D.     On August 9, 2010, Seller filed its First Amended Plan of Reorganization (as may be amended, the "Plan"), which contemplates that the Plan will be funded through a sale of substantially all of the Seller's assets.

E.     Subject to approval of the Bankruptcy Court and the terms and conditions set forth herein, Seller desires to sell and assign to Buyer, and Buyer desires to acquire from Seller, the Facility Assets (hereinafter defined).

F.     The Facility Assets will be sold pursuant to, and in accordance with, the Plan and the Order of the Bankruptcy Court (the "Confirmation Order"), confirming a plan of reorganization, authorizing and approving the sale of the Facility Assets and the assumption and assignment of the Assumed Contracts (as hereinafter defined) pursuant to Section 365 of the Bankruptcy Code in accordance with the terms and conditions of this Agreement.

<u>Agreement</u>

NOW, THEREFORE, taking the foregoing into account, and in consideration of the mutual covenants and agreements set forth herein, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE 1.  SALE AND PURCHASE

1.1.    Facility Assets.  Subject to and in reliance upon the representations, warranties and agreements herein set forth, and subject to the terms and conditions herein contained, Seller shall grant, convey, sell, assign, transfer and deliver to Buyer on the Closing Date (as hereinafter defined) all interests of Seller in all properties, assets, privileges, rights, interests and claims, real and personal, tangible and intangible, of every type and description, wherever located, including its business and goodwill (except for Excluded Assets as defined in Section 1.2) used or held for use in the business and operations of the Facility (collectively, the "Facility Assets"). Without limiting the foregoing, the Facility Assets shall include the following:

(a)    Real Property.  All interests of Seller as of the date of this Agreement in all land, leaseholds, licenses, rights-of-way and other interests of every kind and description in and to all of the real property and buildings thereon, used or held for use in the business and operations of the Facility, including without limitation those listed and described on Schedule 1.1(a) attached hereto, and any additions and improvements thereto between the date of this Agreement and the Closing Date (collectively, the "Real Property");

(b)    Tangible Personal Property.  All interests of Seller as of the date of this Agreement in all equipment, office equipment and supplies, vehicles, inventory of supplies, and other tangible personal property of every kind and description, used or held for use in connection with the business and operations of the Facility, including without limitation those listed and described on Schedule 1.1(b) attached hereto, and any additions and improvements thereto between the date of this Agreement and the Closing Date (collectively, the "Tangible Personal Property");

(c)    Environmental Permits; Permits.  (i) All Environmental Permits related to the ownership, operation, management or use of the Facility that are owned by, issued to, or held by or otherwise benefiting Seller and transferable by their respective terms to Buyer, as listed and described on Schedule 1.1(c)(i) attached hereto; (ii) all Permits related to the ownership, operation, management or use of the Facility that are owned by, issued to, or held by or otherwise benefiting Seller and transferable by their respective terms to Buyer, as listed and described on Schedule 1.1(c)(ii) attached hereto;

(d)    Contracts.  All rights of Seller in those Contracts (other than the Excluded Contracts) to which Seller is a party and which have a term that extends beyond the Closing Date and are used in connection with the business and operations of the Facility that are both (1) listed on Schedule 1.1(d) as being eligible for sale and assignment and (2) listed on Schedule 1.3(c) as being selected by Buyer for purchase and assignment to Buyer (the "Assumed Contracts");

(e)    Intangible Property.  All interests of Seller as of the date of this Agreement in all trademarks, trade names, service marks, copyrights, franchises, patents, jingles, slogans, logotypes and other intangible rights, used or held for use in connection with the business and operations of the Facility, and all of those listed and described on Schedule 1.1(e) attached hereto, and those acquired by Seller between the date hereof and the Closing Date (collectively, the "Intangible Property");

2

(f)     Files and Records.  All of the operating records, customer records, maintenance files, engineering studies, plan and specifications of Seller to the extent related to any Facility Assets (in whatever format they exist, whether in hard copy or electronic format) and (ii) to the extent transferable under applicable law, human resources records, employee personnel files (including all employee benefit files and employee investigation files, if applicable and related files (collectively, "Employee Records") related to employees of Seller, but excluding any files, documents, books and records that constitute Excluded Assets (collectively, "Records"); provided, however, that Seller may retain copies of all Employee Records and all other Records transferred to Buyer pursuant to this Section to the extent needed to comply with any regulations, investigations, audits or inquiries or for ongoing matters relating to the Excluded Assets ("Duplicate Records");

(g)     Prepaid Items.  All deposits, reserves and prepaid expenses relating to the Facility and prepaid taxes relating to the Facility or the Facility Assets;

(h)     Goodwill.  All of Seller's goodwill in, and going concern value of, the Facility;

(i)     Accounts Receivable.  All accounts receivable, and any notes or written obligations reflecting accounts receivable of Seller relating to the Facility as of the Closing Date (the "Receivables"); and

(j)     Warranty Claims.  All Contracts and claims, rights, and interests of Seller against third parties under manufacturers', contractors' and vendors' warranties, if and to the extent that they relate to the Facility Assets.

1.2.    Excluded Assets.  Each of the following assets shall be excluded from the Facility Assets and retained by Seller, to the extent in existence on the Closing Date (the "Excluded Assets"):

(a)     Cash.  Cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), commercial paper, certificates of deposit and other bank deposits, treasury bills and other cash equivalents;

(b)     Insurance.  All rights under any insurance policies of Seller, including any cash surrender value under any such insurance policies;

(c)     Tax Refunds.  All refunds or credits, if any, of Taxes.  "Taxes" means any federal, state, local or non-U.S. net income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, value-added, ad valorem, transfer, franchise, capital, paid-up capital, profits, lease, service, greenmail, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, customs duty or other taxes, governmental fees or other like assessment or charges of any kind whatsoever (including any liability for Taxes incurred or borne as a transferee or successor or by contract, or otherwise), together with any interest or any penalty, addition to taxes or additional

3

amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such taxes;

(d)     Collateral Account. Seller's rights in the collateral account maintained by Evergreen National Indemnity Company;

(e)     Excluded Books and Records and Securities. The minute books, stock transfer books and corporate seal of the Seller, taxpayer and other identification numbers, tax records, and any securities issued by the Seller and its subsidiaries, if any;

(f)     Litigation Claims; Avoidance Actions.  Any and all actions, causes of action, rights (including indemnification), claims, or recoveries of the Seller against third parties arising out of or relating to events prior to the Closing Date (excluding claims referenced in Section 1.1(j) hereof), including but not limited to Seller's claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions;

(g)     Rights Hereunder.  Seller's rights under this Agreement;

(h)     Excluded Contracts.  The specific Contracts designated by Buyer and described in Schedule 1.2(h) (the "Excluded Contracts"); and

(i)     Certain Records.  Those records of Seller to the extent exclusively related to any Excluded Assets (including files related to Taxes and personnel files) and Duplicate Records.

1.3.     Liabilities.

(a)     The Facility Assets shall be sold and conveyed to Buyer free and clear of all mortgages, liens, deeds of trust, security interests, pledges, restrictions, prior assignments, charges, claims, defects in title and encumbrances of any kind or type whatsoever (collectively, "Liens") except: (i) liens for real estate taxes not yet due and payable for which Buyer receives a Purchase Price adjustment under Section 1.5; (ii) zoning ordinances and regulations which do not materially adversely affect Buyer's use or marketability of the Real Property for its current uses and (iii) the post-Closing obligations of Seller which Buyer will assume under Contracts assigned to Buyer that are listed on Schedule 1.1(d) ("Permitted Encumbrances").

(b)     Buyer expressly assumes any and all Liabilities relating to the Facility Assets with respect to Environmental Laws and Environmental Permits whether such Liabilities relate to periods preceding or following the Closing, including all closure/post-closure Liabilities with respect to the Facility Assets (including such Environmental Permits) and all obligations under Applicable Laws, including Environmental Laws) to establish to establish accruals for such Liabilities.

(c)     Buyer expressly assumes all Liabilities relating to or arising out of the Assumed Contracts as set forth on Schedule 1.3(c). At Closing, Buyer shall be required to provide adequate assurance of future performance with respect to the Assumed Contracts.

4

(d)     Except as otherwise specifically provided herein, Buyer shall not assume or be liable for, and does not undertake to assume or discharge:  (i) any liability or obligation of Seller arising out of or relating to any Excluded Contract or Excluded Asset; (ii) any liability or obligation of Seller arising out of or relating to any employee benefit plan otherwise relating to employment; (iii) any liability or obligation of Seller arising out of or relating to any litigation, proceeding or claim (whether or not such litigation, proceeding or claim is pending, threatened or asserted before, on or after the Closing Date), but only the extent such litigation, proceeding or claims arises from an action or incident occurring before the Closing Date; (iv) any other liabilities, obligations, debts or commitments of Seller whatsoever, whether accrued now or hereafter, whether fixed or contingent, whether known or unknown; or (v) any claims asserted against the Facility or any of the Facility Assets relating to any event (whether act or omission) prior to the Closing Date, including without limitation, the payment of all taxes.

(e)     Buyer shall pay, satisfy, discharge, perform and fulfill all obligations and liabilities expressly assumed by Buyer hereunder as they become due, without any charge or cost to Seller, and Buyer agrees to indemnify and hold Seller and its successors and assigns harmless from and against any and all such liabilities in accordance with the terms of Article 10 below.

1.4.    Purchase Price.

(a)     Purchase Price.  The purchase price to be paid for the Facility Assets will be an amount equal to the sum of (i) $_____ (the "Purchase Price"). The amount to be delivered to the Seller at Closing shall be equal to the Purchase Price minus (i) the Deposit (defined below), together with interest and earnings thereon, plus or minus (ii) the Closing Date Adjustments pursuant to Section 1.5 hereof.

(b)     Deposit. Buyer deposited the principal amount of $_____ (the "Initial Deposit") with Seller on _____.  To the extent Buyer is selected as the Successful Bidder (as defined in the Bid Procedures Motion) or the Back-Up Bidder (as defined in the Bid Procedures Motion) after the Auction, Buyer shall deposit the additional sum of $_____ with Seller (together with the Initial Deposit, the "Deposit"). At Closing, Buyer shall receive against the Purchase Price a credit equal to the amount of the Deposit, together with all interest and earnings thereon.

(c)     Method of Payment.    Upon Closing, the amount to be paid under subsection (a) above shall be paid by Buyer in immediately available funds pursuant to written instructions of the Seller to be delivered by Seller to Buyer at least four (4) business days prior to Closing.

(d)     Allocation of Purchase Price.  Buyer and Seller will allocate the Purchase Price in accordance with the respective fair market values of the Facility Assets and the goodwill being purchased and sold in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"). The allocation shall be determined by mutual agreement of the parties. Buyer and Seller each further agrees to file its federal income tax returns and its other tax returns reflecting such allocation.

1.5.    Adjustments.

The operation of the Facility and the income and normal operating expenses attributable thereto through the date immediately preceding the Closing Date (the "Adjustment Date") shall be for the account of Seller and thereafter for the account of Buyer, and, if any income or expense is properly allocable or credited, then it shall be allocated, charged or prorated accordingly; provided, however, that income in respect of the Receivables shall be for the account of Buyer. Expenses for goods or services received both before and after the Adjustment Date, power and utilities charges, and prepaid and deferred items shall be prorated between Seller and Buyer as of the Adjustment Date in accordance with generally accepted accounting principles. All special assessments and similar charges or liens imposed against the Real Property and Tangible Personal Property in respect of any period of time through the Adjustment Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such special assessments, charges or liens in respect of any period of time after the Adjustment Date shall be the responsibility of Buyer, and such charges shall be adjusted as required hereunder. To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Buyer and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within ninety (90) days after the Closing.

1.6.  Closing.  The consummation of the sale and purchase of the Facility Assets provided for in this Agreement (the "Closing") shall take place at the offices of Dilworth Paxson LLP, 1500 Market Street, Suite 3500E, Philadelphia, PA, at a date and time as the parties may mutually agree upon after the date that the Consents discussed in Section 4.3, including the DEP Consent, become final, but in no event later than ten business days after the Consents become final, subject to the satisfaction or waiver of the last of the conditions required to be satisfied or waived pursuant to Articles 7 or 8 below (other than those requiring a delivery of a certificate or other document, or the taking of other action, at the Closing). Alternatively, the Closing may take place at such other place, time or date as the parties may mutually agree upon in writing. The date on which the Closing occurs is referred to herein as the "Closing Date."

1.7.  Third-Party Consents.  Seller and Buyer acknowledge and agree that the Confirmation Order of the Bankruptcy Court authorizing and approving (1) the sale of the Facility Assets; and (2) the assumption, sale and assignment of the Assumed Contracts under Sections 363 and 365 of the Bankruptcy Code in accordance with the terms and conditions of this Agreement, will authorize the assumption, sale and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto and will constitute an order holding unenforceable any anti-assignment or anti-alienation provision of all Assumed Contracts. Seller and Buyer shall cooperate and use their best efforts in the presentation of evidence and seeking the entry of such an order. To the extent any Assumed Contract is not assumable, salable and assignable by Seller to Buyer under Sections 363 and 365 of the Bankruptcy Code without the consent of the parties thereto, Seller and Buyer shall make commercially reasonable efforts prior to Closing to obtain all required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without payment of money by or conditions materially adverse to Seller or Buyer). All such third-party consents shall be in writing and executed counterparts thereof shall be delivered to Buyer promptly after Seller's receipt thereof, but in no event later than two (2) business days prior to the Closing Date. Notwithstanding the foregoing or anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any lease of Real Property or Assumed Contract or any

6

claim or right or any benefit arising thereunder or resulting therefrom if (i) the term of the lease of Real Property or Assumed Contract has expired by its terms as of the Closing Date; or (ii) an attempted assignment thereof, without the consent of a third party thereto, would constitute a default thereof or in any way materially adversely affect the rights of Buyer thereunder.

ARTICLE 2. <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

Seller represents and warrants to Buyer as follows:

2.1.  <u>Status</u>.  Seller is duly organized, validly existing and subsisting under the laws of the Commonwealth of Pennsylvania. Seller has the requisite power to carry on the business of the Facility as it is now being conducted and to own and operate the Facility, and Seller has the requisite power to enter into and complete the transactions contemplated by this Agreement. Seller has not used any name in the operation of its business other than its name as first set forth above and Rustick, LLC, debtor-in-possession.

2.2.  <u>Authority</u>.  Subject to entry of the Confirmation Order, all actions necessary to be taken by or on the part of Seller in connection with the transactions contemplated by this Agreement have been duly and validly taken, and this Agreement has been duly and validly authorized, executed, and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

2.3.  <u>No Conflict</u>.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (a) violate any judgment, decree, order, statute, law; or (b) to its knowledge, violate any rule or regulation applicable to Seller, the Facility or any of the Facility Assets.

2.4.  <u>Permits</u>.  To Seller's knowledge, the Permits listed on <u>Schedule 1.1(c)(ii)</u> comprise all material Permits (excluding Environmental Permits) necessary to enable Seller to own and use the Facility Assets and conduct its business as currently conducted. Except as set forth on <u>Schedule 2.4</u> Seller is in compliance with the terms and conditions of all such Permits, except for such failure which would not reasonably be expected to have a Seller Material Adverse Effect, and no proceedings are pending or, to Seller's knowledge, threatened that may result in the revocation, cancellation, suspension, limitation or adverse modification of any of the same. Except for matters that would not reasonably be expected to have a Seller Material Adverse Effect, there are no defects in any of such Permits. The Permits are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated and have not expired.

2.5.  <u>Approvals and Consents</u>.  Except as described in <u>Schedule 2.5</u> hereto, the execution, delivery and performance by the Seller of this Agreement and the consummation by it of the transactions contemplated hereby will not require any consent, permit, license or approval of, or filing with or notice to, any person, entity or governmental or regulatory authority under any provision of law applicable to Seller or any Contract or Real Property lease to which Seller is a party, except as contemplated by Section 4.6 (Hart-Scott-Rodino).

2.6.    _Facility Assets_.  The Facility Assets constitute all of the assets necessary to conduct the present operations of the Facility. Schedule 1.1(b) contains a description of all items of Tangible Personal Property having an original cost in excess of $1,000. Seller has good, valid and marketable title to all of the Facility Assets.

2.7.    _Real Property_.

(a)    Schedule 1.1(a) contains legal descriptions of all real property owned or leased by Seller and used or held for use in connection with the business and operations of the Facility and leases or licenses or other rights to possession of any real property so used or held.

(b)    Seller's interests in Real Property are as follows: Seller has fee simple title to the Real Property so described by metes and bounds on Schedule 1.1(a) as being so owned (the "Owned Real Property"). As to the Owned Real Property, Seller has good, valid and marketable fee simple title to such premises. The Owned Real Property includes sufficient access for usual street, road, utility purposes or other purposes necessary or incidental to the business and/or operation of the Facility without need to obtain any other access rights.

(c)    Seller's interests in Leased Real Property not described in Section 2.7(b) herein are as follows: Seller leases, as a tenant, the premises described on Schedule 1.1(a) as being so leased. The leases listed in Schedule 1.1(a) hereto constitute all the Real Property leases to which Seller is a party (either as lessor or lessee) and which are required or useful in the conduct of the business of the Facility. Seller has delivered to Buyer true and complete copies of such leases.

(d)    Subject to giving effect to assumption and assignment of Contracts, and payment of cure amounts with respect to the Leased Real Property listed in Schedule 1.1(a) hereto, Seller has good title to its interest in such Real Property. With respect to each such lease relating to Leased Real Property, (i) each such lease is in full force and effect, and is valid, binding and enforceable in accordance with its terms, (ii) all accrued and currently payable rents and other payments required thereunder have been paid, (iii) each such lease was entered into in the ordinary course of business and has provided for peaceable possession since the beginning of the original term thereof, (iv) the Seller has complied with all material covenants and provisions thereof applicable to it, (v) the Seller is not in default in any material respect thereunder, (vi) no party has asserted any defense, set off or counterclaim thereunder, (vii) no waiver, indulgence, or postponement of any obligations thereunder has been granted by any party, (viii) no notice of default or termination has been given or received, no event of default has occurred of which Seller has knowledge, and Seller has no knowledge of the existence of any condition or the occurrence of any event that, with the giving of notice, the lapse of time, or the happening of any further event would become a default or permit early termination thereunder, (ix) Seller has not violated any term or condition thereunder, and (x) the validity or enforceability thereof will in no way be affected by the sale of the Facility Assets as contemplated herein. Each such lease provides sufficient access to the Facility' facilities without need to obtain any other access rights. Except as set forth in Schedule 2.5 hereto, no third-party consent or approval is required for the assignment of any such lease to Buyer, or for the consummation of the transactions contemplated herein.

(e)     Sellers use of the Real Property does not require any special use permits, zoning variances or exceptions.

2.8.    <u>Environmental Matters</u>.

(a)     Except as described in <u>Schedule 2.8</u>, Seller represents and warrants that:

(i)     all activities of the Facility or of Seller with respect to the Facility and the Real Property have been and are being conducted in material compliance with all Environmental Laws and Environmental Permits, as well as all requirements of common law concerning those activities, repairs or construction of any improvements, manufacturing processing and/or handling of any materials, and discharges to the air, soil, surface water or groundwater;

(ii)    Seller has not generated, manufactured, refined, transported, stored, handled, disposed of or released any Hazardous Material on the Real Property;

(iii)   Seller has obtained all approvals and caused all notifications to be made as required by Environmental Laws;

(iv)    <u>Schedule 2.8</u> contains a complete list of all of Seller's material Environmental Permits. Such Environmental Permits comprise all of the Environmental Permits required to operate the Facility Assets as currently operated, and Seller is in compliance with each such Environmental Permit, except where the failure to have or be in compliance with such Environmental Permits would not have a Seller Material Adverse Effect;

(v)     Seller has not received any notice of any violation of any Environmental Laws;

(vi)    no action has been commenced or threatened regarding Seller's compliance with any Environmental Laws;

(vii)   Seller has no knowledge that any tanks used for the storage of any Hazardous Material above or below ground are present or were at any time present on or about the Owned Real Property;

(viii)  Seller has no knowledge that any action has been commenced or threatened regarding the presence of any Hazardous Material on or about the Owned Real Property;

(ix)    no Hazardous Materials are present in any medium in the operations of the Facility (or of Seller with respect to the Facility); Seller has no knowledge that any Hazardous Material are present in any medium at the Owned Real Property in such a manner as may require investigation or remediation under any applicable law;

(x)     Seller has no knowledge that any polychlorinated biphenyls or substances containing polychlorinated biphenyls are present on the Owned Real Property;

9

(xi)     Seller has no knowledge that any friable asbestos is present in the operations of the Facility and/or on the Owned Real Property;

(xii)    no portion of the Real Property is on a CERCLA, CERCLIS or RCRIS list or the National Priorities List of Hazardous Waste Sites or any similar list or database maintained by the Commonwealth of Pennsylvania or any agency or department thereof, nor is Seller listed as, nor has it been notified that it is a "potentially responsible person" with respect to the Facility Assets; and

(xiii)   Except as described in <u>Schedule 2.8</u> hereto, Seller is aware of no facts indicating that Seller is not in compliance with all requirements of DEP, the Environmental Laws or any other applicable federal, state and local statutes, regulations and ordinances. Except as described in <u>Schedule 2.8</u> hereto, Seller is aware of no facts and Seller has received no notice or communication, formal or informal, indicating that DEP is considering revoking, suspending, canceling, rescinding or terminating any Permits.

(b)      Seller has not and will not release or waive the liability of any previous owner, lessee, or operator of the Real Property or any party who may be potentially responsible for the presence or removal of Hazardous Material on or about the Real Property. Seller has no indemnification obligation regarding Hazardous Material to any party.

2.9.     <u>Compliance with Law</u>.  Except as described in the Schedules hereto, the Facility, the Facility Assets and Seller with respect to the Facility and the Facility Assets are, in all material respects, in compliance with all requirements of law, federal, state and local, and all requirements of all governmental bodies or agencies having jurisdiction over any of them, the operation of the Facility, the use of its properties and assets (including the Facility Assets), and the Real Property. Without limiting the foregoing, Seller has paid all monies and obtained all licenses, permits, certificates and authorizations needed or required for the operation of the Facility and the use of the Real Property. Seller has properly filed all reports and other documents required to be filed with any federal, state, local or foreign government or subdivision or agency thereof. Seller has not received any notice, not heretofore complied with, from any federal, state or municipal authority or any insurance or inspection body that any of its properties, facilities, equipment or business procedures or practices fails to comply with any applicable law, ordinance, regulation, building or zoning law, or requirement of any public authority or body.

2.10.    <u>Employment Matters</u>.

(a)      There are no collective bargaining agreements, or written or oral agreements relating to the terms and conditions of employment or termination of employment, covering any employees, consultants or agents of the Facility, except as listed and described in <u>Schedule 2.10</u> hereto. Except as listed and described in <u>Schedule 2.10</u>, none of the employees of the Facility have written employment contracts. Seller is not engaged in any unfair labor practice or other unlawful employment practice, and there are no unfair labor practice charges or other employee related complaints, grievances or arbitrations, against Seller pending before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, the Department of Labor, any arbitration

tribunal or any other federal, state, local or other governmental authority by or concerning Seller's employees. There is no strike, picketing, slowdown or work stoppage by or concerning such employees pending against or involving Seller. No representation question is pending or threatened respecting any of Seller's employees. Seller has delivered to Buyer copies of all letters, memoranda of understanding, past practices, assurances or other agreements modifying such collective bargaining agreements and other similar employee agreements.

(b)     All handbooks, policies and procedures relating to all aspects of employment, including but not limited to compensation, benefits, equal employment opportunity and safety are listed and described in Schedule 2.10 attached hereto.

(c)     The Facility, and Seller with respect to the Facility, have complied with in the past and are now in material compliance with all labor and employment laws, including without limitation federal, state, local and other applicable laws, rules, regulations, ordinances, order and decrees concerning collective bargaining, unfair labor practices, payments of employment taxes, occupational safety and health, worker's compensation, the payment of wages and overtime, and equal employment opportunity.  To its knowledge, the Facility and Seller with respect to the Facility, are not liable for any arrears or wages, benefits, taxes, damages or penalties for failing to comply with any law, rule, regulation, ordinance, order or decree relating in any way to labor or employment.

(d)     Seller has provided to Buyer the names of all present employees of Seller and the positions, total annual compensation and accrued vacation and sick time of each.

2.11.   <u>Litigation</u>.  Except as described in <u>Schedule 2.11</u> hereto, there are no suits, arbitrations, administrative charges or other legal proceedings, claims or governmental investigations pending against, or threatened against, the Facility or Seller relating to or affecting the Facility nor, to the best of the knowledge of Seller, is there any basis for any such suit, arbitration, administrative charge or other legal proceeding, claim or governmental investigation. Seller has not been operating under or subject to, or in default with respect to, any judgment, order, writ, injunction or decree of any court or federal, state, municipal or other governmental department, commission, board, agency or instrumentality, foreign or domestic.

2.12.   <u>Intangible Property</u>.  Seller has all right, title and interest in and to all Intangible Property necessary to the conduct of the Facility as presently operated. <u>Schedule 1.1(e)</u> contains a description of all material Intangible Property.  Seller has received no notice of any claim that any Intangible Property or the use thereof conflicts with, or infringes upon, any rights of any third party (and there is no basis for any such claim of conflict). The Facility has the sole and exclusive right to use the Intangible Property. No service provided by the Facility or any programming or other material used, broadcast or disseminated by the Facility infringes upon any copyright, patent or trademark of any other party.

2.13.   <u>Brokers</u>.  Except as described in <u>Schedule 2.13</u> hereto, there is no broker or finder or other person entitled to a commission or brokerage fee or payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement of, or action taken by, Seller.

873328_3

2.14.  <u>Absence of Material Change</u>.  Since the Petition Date:

(i)  There has not been and there is not threatened any material adverse change in the financial condition, business, prospects or affairs of Seller relating to the Facility or any material physical damage or loss to any of the Facility Assets (whether or not such damage or loss is covered by insurance);

(ii)  Seller has not taken any action with respect to the Facility outside of the ordinary and usual course of business, except as related to the transactions contemplated hereby;

(iii)  Seller has maintained its books, accounts and records in the usual, customary and ordinary manner; and

(iv)  Seller with respect to the Facility has preserved its business organization intact, kept available the services of its employees, and preserved its relationships with its customers, suppliers and others with whom it deals.

2.15.  <u>Affiliates</u>.  No Affiliate of Seller has an interest in any of the Facility Assets or any property used in the operation of the Facility. Neither Seller nor any Affiliate of Seller, has any financial interest in any supplier, advertiser or customer of Seller or in any other business with which Seller does business or competes. For purposes of this Agreement, an "Affiliate" of an entity means any person (or any relative of any person) or entity that owns or controls, is owned or controlled by, or under common control with, such entity.

2.16.  <u>Disclosure</u>.  No provision of this Agreement relating to Seller, the Facility or the Facility Assets or any Schedule, Exhibit hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated in order to make the statement, in light of the circumstances in which it is made, not misleading.

ARTICLE 3.  <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Seller:

3.1.  <u>Status</u>.  The Buyer is a corporation which is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Buyer has the requisite power to enter into and complete the transactions contemplated by this Agreement.

3.2.  <u>Authority</u>.  All corporate actions necessary to be taken by or on the part of Buyer in connection with the transactions contemplated by this Agreement have been duly and validly taken, and this Agreement has been duly and validly authorized, executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with and subject to its terms.

3.3.  <u>No Conflicts</u>.  Neither the execution, delivery and performance by Buyer of this Agreement nor the consummation by Buyer of the transactions contemplated hereby will:  (a) conflict with or violate the certificate of incorporation or bylaws of Buyer; or (b) violate any judgment, decree, order, statute, rule or regulation applicable to Buyer.

873328_3

3.4.    Brokers.  There is no broker or finder or other person entitled to a commission or brokerage fee or payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement of or action taken by Buyer.

3.5.    Approvals and Consents.  The execution, delivery and performance by the Buyer of this Agreement and the consummation by it of the transactions contemplated hereby will not require any consent, permit, license or approval of, or filing with or notice to, any person, entity or governmental or regulatory authority under any provision of law applicable to Buyer or any Contract or Real Property lease to which Buyer is a party, except as contemplated by Schedule 2.5.

ARTICLE 4.  COVENANTS OF SELLER

Seller covenants and agrees that from the date hereof until the completion of the Closing:

4.1.    Operation of the Business.

(a)    Seller shall continue to carry on the business of the Facility and keep its books and accounts, records and files in the usual and ordinary manner in which the business has been conducted in the past. Seller shall collect the Facility's accounts receivable only in the ordinary course of business consistent with past practice, and shall not discount, or otherwise reduce the amount owed in respect of, any Receivables. Seller shall operate the Facility in accordance with the terms of the Permits and in compliance in all material respects with all applicable laws, rules and regulations and all applicable Environmental Laws. Seller shall maintain the Permits and the Environmental Permits in full force and effect and shall timely file and prosecute any necessary applications for renewal of the Permits and the Environmental Permits.

(b)    Seller shall provide Buyer with copies of the regular monthly internal operating statements relating to the Facility for the monthly accounting periods between the date of this Agreement and the Closing Date by the 20th day of each calendar month for the preceding calendar month, which shall present fairly the financial position of the Facility and the results of operations for the period indicated in accordance with generally accepted accounting principles. Such monthly statements shall show: (i) the actual results for such month and the budget for such month by line item, and (ii) account for items of non-recurring income and expense separately and (iii) account for and separately state all intercompany allocations of expenses relating to the Facility, all of which shall be presented fairly and in accordance with generally accepted accounting principles.

(c)    Seller shall make all reasonable efforts to preserve the business organization of the Facility intact, retain substantially as at present the Facility's employees, consultants and agents, and preserve the goodwill of the Facility's suppliers, advertisers, customers and others having business relations with it.

(d)    Seller shall make all reasonable efforts to maintain all Tangible Personal Property and Real Property in substantially its condition on the date of this Agreement (ordinary wear and tear excepted) and repair and maintain adequate and usual supplies of inventory, office

13

supplies, spare parts and other materials as have been customarily maintained in the past. Seller shall make all reasonable efforts to preserve intact the Facility Assets and maintain in effect its current casualty and liability insurance on the Facility Assets.

(e)    Prior to the Closing Date, Seller shall not, without the prior written consent of Buyer:

(i)    sell, lease, transfer, or agree to sell, lease or transfer, any Facility Assets except for sales or leases, in the ordinary course of business of items which are being replaced by assets of comparable or superior kind, condition and value;

(ii)    except as may be required by applicable law, grant any raises to employees of the Facility, pay any substantial bonuses or enter into any contract of employment with any employee or employees of the Facility, except in the ordinary course of business;

(iii)    renew, renegotiate, modify, amend or terminate any existing disposal contracts with respect to the Facility, except in the ordinary course of business;

(iv)    enter into, renew or amend any other Contract with respect to the Facility, except in the ordinary course of business;

(v)    make any change in any of the buildings, leasehold improvements or fixtures of the Facility, except in the ordinary course of business; or

(vi)    enter into any barter or trade contracts that are prepaid, or any contract with an affiliate of Seller.

4.2.    _Access to Facilities, Files and Records_.  At the request of Buyer, Seller shall from time to time give or cause to be given to the officers, employees, accountants, counsel, agents, consultants and representatives of Buyer: (a) reasonable access during normal business hours to all facilities, properties, accounts, books, deeds, title papers, insurance policies, licenses, agreements, contracts, commitments, records and files of every character, equipment, machinery, fixtures, furniture, vehicles, notes and accounts payable and receivable of Seller with respect to the Facility; and (b) all such other information concerning the affairs of the Facility as Buyer may reasonably request. Seller shall cause its accountants and any agent of Seller in possession of Seller's books and records to cooperate with Buyer's requests for information pursuant to this Agreement.

4.3.    _Consents_.  Seller shall use its best efforts to obtain all of the consents noted on Schedule 2.5 hereto, including any consents required by the DEP for transfer of the Permits to Buyer (the "DEP Consent"). If Seller does not obtain a consent required to assign a contract or lease hereunder, Buyer shall not be required to assume such contract or lease. Marked with an asterisk on Schedule 2.5 are those consents the receipt of which is a condition precedent to Buyer's obligation to close under this Agreement (the "Required Consents").

4.4.    _Notice of Proceedings_.  Seller will promptly notify Buyer in writing upon: (a) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated

873328_3

hereunder; or (b) receiving any notice from any governmental department, court, agency or commission of its intention (i) to institute an investigation into, or institute a suit or proceeding to restrain or enjoin, the consummation of this Agreement or such transactions, or (ii) to nullify or render ineffective this Agreement or such transactions if consummated.

4.5.  <u>Consummation of Agreement</u>.  Subject to the provisions of Section 10.1 of this Agreement: (a) Seller shall fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and cause the transactions contemplated by this Agreement to be fully carried out; and (b) Seller shall not take any action that would make the consummation of this Agreement contrary to the Environmental Laws or the rules or regulations of DEP.

4.6.  <u>Hart-Scott-Rodino</u>.  As soon as possible (but in no event later than seven calendar days after the date of this Agreement), if necessary, Seller shall prepare and file all documents with the Federal Trade Commission and the United States Department of Justice as are required to comply with the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "Hart-Scott-Rodino Act"), request early termination of the waiting period, and shall thereafter furnish promptly all materials thereafter requested by any of the regulatory agencies having jurisdiction over such filings.

4.7.  <u>Confidentiality</u>.  Any and all information, disclosures, knowledge or facts regarding Buyer or its business or properties to which Seller is exposed as a result of the negotiation, preparation or performance of this Agreement shall be confidential and shall not be divulged, disclosed or communicated to any other person, firm, corporation or entity, except for Seller's employees, attorneys, accountants, investment bankers, investors and lenders, and their respective attorneys, on a need-to-know basis for the purpose of consummating the transactions contemplated by this Agreement.

4.8.  <u>Employee Matters</u>.

(a)  Buyer may offer employment to any of Seller's employees of the Facility (each an "Employee") who is available for work on the Closing Date.

(b)  Seller agrees to make available to Buyer, to the fullest extent permitted by law, all information and materials requested by Buyer from the personnel files of each employee of Seller who shall have elected to accept employment with Buyer.

(c)  Buyer shall have no obligation to continue or assume any compensation arrangements or liabilities of Seller (including, but not limited to, any salary, bonuses, fringe benefits, insurance plans, or pension or retirement benefits under any compensation or retirement plan maintained by Seller) to any such Employee.

(d)  Seller shall remain responsible for the payment of all accrued benefits in accordance with the terms of Seller's retirement plans, including any retiree medical, dental and life insurance plan prior to the Closing Date, subject to the provisions of the Bankruptcy Code and rules. Buyer shall not at any time assume any liability under Seller's retirement plans for the

payment of benefits to any active or any terminated, vested or retired participants in Seller's retirement plans.

(e)     Seller shall retain the responsibility for payment of all medical, dental, health and disability claims incurred by any Employee prior to the Closing Date, subject to the provisions of the Bankruptcy Code and rules, and Buyer shall not assume any liability with respect to such claims. Seller also shall retain responsibility for disability payments to employees on medical or disability leave at the Closing Date until such time as such Employee is employed by Buyer, in its sole discretion, or as otherwise required under applicable law or regulation. Except as provided in the immediately preceding sentence, Seller shall have no responsibility for payment of medical, dental, health and disability claims incurred by Employees. Buyer shall assume responsibility for payment of all medical, dental, health and disability claims incurred by Employees in its employ on or after the Closing Date, to the extent such claims are covered under Buyer's benefit plans and in which the affected Employee is a participant.

(f)     Seller agrees that it shall retain all liabilities and obligations, if any (including, without limitation, the liability and obligation for all wages, salary, vacation pay and unemployment, medical, dental, health and disability benefits), for those former employees of Seller who retired or terminated employment prior to the Closing Date or otherwise do not become employees of Buyer.

(g)     Seller, with respect to the Employees, will timely give all notices required to be given under the Worker Adjustment and Retraining Notification Act of 1988 or similar statutes or regulation of any jurisdiction relating to any plant closing or mass lay off or as otherwise required by law and shall fully indemnify and hold harmless Buyer with respect to any liability that may arise with respect thereto relating to the Employees.

ARTICLE 5.  <u>COVENANTS OF BUYER</u>

Buyer covenants and agrees that from the date hereof until the completion of the Closing:

5.1.    <u>Representations and Warranties</u>.  Buyer shall give detailed written notice to Seller promptly upon learning of the occurrence of any event that would cause or constitute a breach or would have caused a breach had such event occurred or been known to Buyer prior to the date hereof, of any of the representations and warranties of Buyer contained in this Agreement.

5.2.    <u>Consummation of Agreement</u>.  Subject to the provisions of Section 10.1 of this Agreement, Buyer shall use all reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transactions contemplated by this Agreement to be fully carried out.

5.3.    <u>Notice of Proceedings</u>.  Buyer will promptly notify Seller in writing upon:  (a) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated hereunder; or (b) receiving any notice from any governmental department, court, agency or commission of its intention (i) to institute an investigation into, or institute a suit or proceeding

to restrain or enjoin, the consummation of this Agreement or such transactions, or (ii) to nullify or render ineffective this Agreement or such transactions if consummated.

5.4.  Hart-Scott-Rodino.  As soon as possible (but in no event later than seven calendar days after the date of this Agreement), if necessary, Buyer shall prepare and file all documents with the Federal Trade Commission and the United States Department of Justice as are required to comply with the Hart-Scott-Rodino Act, request early termination of the waiting period thereof, and shall thereafter furnish promptly all materials thereafter requested by any of the regulatory agencies having jurisdiction over such filings.

5.5.  Confidentiality.  Any and all information, disclosures, knowledge or facts regarding Seller, the Facility and their operation and properties derived from or resulting from Buyer's acts or conduct (including without limitation acts or conduct of Buyer's officers, employees, accountants, counsel, agents, consultants or representatives, or any of them) under the provisions of Section 4.2 hereof shall be confidential and shall not be divulged, disclosed or communicated to any other person, firm, corporation or entity, except for Buyer's attorneys, accountants, investment bankers, investors and lenders, and their respective attorneys for the purpose of consummating the transactions contemplated by this Agreement.

ARTICLE 6.  AGREEMENT OF SELLER AND BUYER.

6.1.  Certain Other Matters. Seller and Buyer hereby acknowledge and agree as follows: (a) Buyer has conducted an independent investigation of the Facility Assets and, except for the representations, warranties covenants and obligations of Seller expressly set forth in this Agreement, is purchasing the Facility Assets on an "as-is, where-is" basis, (b) except as expressly set forth in this Agreement, Seller makes no representations or warranties, express or implied, at law or in equity, in respect of the Facility Assets or otherwise in connection with this Agreement including with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed, (c) Buyer has not relied on any representations or warranties by or on behalf of Seller in connection with its execution of this Agreement or the consummation of the transactions contemplated by this Agreement, and any such other representations or warranties shall not be implied at law or in equity, (d) except as expressly set forth in this Agreement, Buyer makes no representations or warranties, express or implied, at law or in equity, in connection with this Agreement, and any such other representations or warranties are hereby expressly disclaimed, and (e) Seller has not relied on any representation or warranties by or on behalf of Buyer in connection with its execution of this Agreement or the consummation of the transactions contemplated by this Agreement, and any such other repetitions or warranties shall not be implied at law or in equity. The terms and provisions of this paragraph shall survive the Closing.

ARTICLE 7.  CONDITIONS TO THE OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are, at its option, subject to the fulfillment of the following conditions prior to or on the Closing Date:

7.1.  Representations, Warranties and Covenants.

(a)     Each of the representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects as of the date when made and shall be deemed to be made again on and as of the Closing Date and shall then be true and correct, except to the extent changes are permitted or contemplated pursuant to this Agreement.

(b)     Buyer shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     Buyer shall have furnished Seller with a certificate, dated the Closing Date and duly executed by an officer authorized on behalf of Buyer to give such a certificate, to the effect that the conditions set forth in Sections 7.1(a) and (b) have been satisfied.

7.2.    Proceedings.

(a)     Neither Seller nor Buyer shall be subject to any restraining order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

(b)     In the event such a restraining order or injunction is in effect, this Agreement may not be abandoned by Seller pursuant to this Section 7.2 prior to the Closing Date, but the Closing shall be delayed during such period. This Agreement may be abandoned if such restraining order or injunction remains in effect for more than ninety (90) days after receipt of all Consents.

7.3.    DEP Consent.  The DEP Consent shall have been granted.

7.4.    Hart-Scott-Rodino.  If applicable, the waiting period under the Hart-Scott-Rodino Act shall have expired or been terminated.

7.5.    Deliveries.  Buyer shall have complied with each and every one of its obligations set forth in Section 9.2.

7.6.    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Confirmation Order which, inter alia, shall have approved this Agreement.

ARTICLE 8. CONDITIONS TO THE OBLIGATIONS OF BUYER

The obligations of Buyer under this Agreement are, at its option, subject to the fulfillment of the following conditions prior to or on the Closing Date:

8.1.    Representations, Warranties and Covenants.

(a)     Each of the representations and warranties of Seller contained in this Agreement shall have been true and correct as of the date when made and shall be deemed to be made again on and as of the Closing Date and shall then be true and correct except to the extent changes are permitted or contemplated pursuant to this Agreement.

18

(b)     Seller shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     Seller shall have furnished Buyer with a certificate, dated the Closing Date and duly executed by an officer authorized on behalf of Seller to give such a certificate, to the effect that the conditions set forth in Sections 8.1(a) and (b) have been satisfied.

8.2.    <u>Proceedings</u>.

(a)     Neither Seller nor Buyer shall be subject to any restraining order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

(b)     In the event such a restraining order or injunction is in effect, this Agreement may not be abandoned by Buyer pursuant to this Section 8.2 prior to the Closing Date, but the Closing shall be delayed during such period. This Agreement may be abandoned after such date if such restraining order or injunction remains in effect for more than one hundred eighty (180) days after receipt of all Consents.

8.3.    <u>Hart-Scott-Rodino</u>.  If applicable, the waiting period under the Hart-Scott-Rodino Act shall have expired or been terminated.

8.4.    <u>Deliveries</u>.  Seller shall have complied with each and every one of its obligations set forth in Section 9.1.

8.5.    <u>Required Consents</u>.  Seller shall have obtained all of the Required Consents, including the DEP Consent.

8.6.    <u>Bankruptcy Court Approval</u>. Seller shall have obtained the approval of the Bankruptcy Court of this Agreement and the sale of the Facility hereunder.

ARTICLE 9.  <u>ITEMS TO BE DELIVERED AT THE CLOSING</u>

9.1.    <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver to Buyer duly executed by Seller or such other signatory as may be required by the nature of the document:

(a)     bills of sale, certificates of title, endorsements, assignments, special warranty deed and other good and sufficient instruments of sale, conveyance, transfer and assignment, in form and substance satisfactory to Buyer, sufficient to sell, convey, transfer and assign Facility Assets to Buyer free and clear of any Liens (other than Permitted Encumbrances) and to quiet Buyer's title thereto;

(b)     certified copies of appropriate resolutions, duly adopted, which shall be in full force and effect at the time of the Closing, authorizing the execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby; and

(c)     the certificate referred to in Section 8.1(c).

9.2.   Deliveries by Buyer.  At the Closing, Buyer shall deliver to Seller:

(a)   the Purchase Price, which shall be paid in the manner specified in Section 1.4;

(b)   an instrument or instruments of assumption of the Contracts and Real Property leases to be assumed by Buyer pursuant to this Agreement; and

(c)   certified copies of resolutions, duly adopted by the Boards of Directors of each Buyer, which shall be in full force and effect at the time of the Closing, authorizing the execution, delivery and performance by each Buyer of this Agreement and the consummation of the transactions contemplated hereby.

## ARTICLE 10.  MISCELLANEOUS

10.1.   Termination.  This Agreement may be terminated at any time prior to Closing: (a) by the mutual consent of Seller and Buyer; (b) by any party hereto if the DEP or the Bankruptcy Court has denied the approvals contemplated by this Agreement in an order which has become Final; (c) by Buyer under the provisions of Section 2.8 (Environmental Matters); (d) by Buyer as provided in Section 10.6 (Risk of Loss); (e) by Buyer or Seller if the Closing has not taken place by the Closing Date; (f) by Buyer, if on the Closing Date Seller has failed to satisfy the conditions set forth in Section 7.3, 7.4 or 7.5; (g) by Buyer if Seller has failed to cure a material breach of any of its representations, warranties or covenants under this Agreement within fifteen (15) calendar days after it receives notice from Buyer of such breach; (h) by Seller, if on the Closing Date Buyer has failed to satisfy the conditions set forth in Section 8.4 or 8.5; (i) by Seller if Buyer has failed to cure a material breach of any of its representations, warranties or covenants under this Agreement within fifteen (15) calendar days after it receives notice from Seller of such breach; or (j) if the Seller's bankruptcy filing is dismissed or converted to a filing under Chapter 7 of the Bankruptcy Code. A termination pursuant to this Section 10.1 shall not relieve any party of any liability it would otherwise have for a breach of this Agreement.

If this Agreement is terminated by reason of clauses (a), (b), (c), (d), (e), (f), (g) or (j), in the preceding paragraph, Seller shall promptly return the Deposit, together with interest thereon, to the Buyer.  If this Agreement is terminated by reason of clauses (h) or (i), Seller shall be entitled to retain the Deposit, together with interest thereon, as liquidated damages in full and complete satisfaction of any and all damages incurred by Seller on account of such default by Buyer, it being acknowledged and agreed that in the event of any such default it would be difficult or impossible to ascertain the precise amount of such damages, and the amount of the Deposit is a fair and reasonable estimate of the amount of such damages.

10.2.   Expenses.  Each party hereto shall bear all of its expenses incurred in connection with the transactions contemplated by this Agreement, including without limitation, accounting and legal fees incurred in connection herewith; provided, however, that: (i) Buyer shall be exclusively responsible for, and Seller shall not have any liability or responsibility for any sales or transfer taxes (including without limitation any real estate transfer taxes), arising from the transfer of the Facility Assets to Buyer; and (ii) Buyer shall pay any Hart-Scott-Rodino Act filing fees, if applicable.

The parties recognize and acknowledge that they may be exempt under Section 1146(c) of the Bankruptcy Code and the Confirmation Order from state and local transfer, recording, stamp or other similar transfer taxes (collectively, the "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Facility Assets; provided, however, that if Transaction Taxes are assessed for any reason, Buyer shall be solely responsible for the payment of such Transaction Taxes, along with any recording and filing fees. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated by this Agreement.

10.3. <u>Remedies Cumulative</u>. The remedies provided in this Agreement shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against the other party hereto.

10.4. <u>Further Assurances</u>. From time to time prior to, on and after the Closing Date, each party hereto will execute all such instruments and take all such actions as any other party shall reasonably request, without payment of further consideration, in connection with carrying out and effectuating the intent and purpose hereof and all transactions contemplated by this Agreement, including without limitation the execution and delivery of any and all confirmatory and other instruments in addition to those to be delivered on the Closing Date, and any and all actions which may reasonably be necessary to complete the transactions contemplated hereby. The parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement.

10.5. <u>Public Announcements</u>.

(a) Prior to the Closing Date, no party shall, without the approval of the other party hereto, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except (i) to announce it has been entered into, and (ii) as and to the extent that such party shall be so obligated by law, in which case such party shall give advance notice to the other party and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued.

10.6. <u>Risk of Loss</u>. The risk of loss, damage or destruction to any of the Facility Assets shall be borne by Seller at all times up to 12:01 a.m. local time on the Closing Date, and it shall be the responsibility of Seller to repair or cause to be repaired and to restore the property to its condition prior to any such loss, damage, or destruction. In the event of any such loss, damage, or destruction, the proceeds of any claim for any loss, payable under any insurance policy with respect thereto, shall be used to repair, replace, or restore any such property to its former condition, subject to the conditions stated below. In the event of any loss or damage to any of the Facility Assets, Seller shall notify Buyer thereof in writing immediately. Such notice shall specify with particularity the loss or damage incurred, the cause thereof (if known or reasonably ascertainable), and the insurance coverage. In the event that the property is not completely repaired, replaced or restored on or before the scheduled Closing Date, Buyer at its option: (a) may elect to postpone Closing until such time as the property has been completely repaired, replaced or restored; or (b) may elect to consummate the Closing and accept the property in its

then condition, in which event Seller shall pay to Buyer all proceeds of insurance and assign to Buyer the right to any unpaid proceeds; or (c) terminate this Agreement.

ARTICLE 11. <u>DEFINITIONS</u>

As used in this Agreement, the following capitalized terms shall have the meanings given to them below:

"Applicable Laws" means all federal, state, local and foreign statutes, laws, rules, regulations, orders, ordinances (including zoning restrictions and land use requirements and Environmental Laws and regulations) and all administrative and judicial judgments, rulings, decisions and orders applicable to Seller, Buyer or the Facility Assets.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980

"Contract" means any agreement, contract, arrangement, understanding, lease, note, bond, mortgage, indenture, loan agreement, franchise agreement, covenant, employment agreement, license instrument, purchase and sales order, commitment, undertaking, obligation, or other legally binding agreement, whether written or oral, and including all amendments thereto.

"Encumbrances" means liens, security interests, encumbrances, adverse claims, leases, rights of repurchase or purchase, rights of first refusal, pledges, voting trusts, equities and other restrictions, limitations or conditions on transfer of any nature whatsoever.

"Environmental Laws" means all Applicable Laws relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including laws and regulations relating to workplace or worker safety and health or emissions, discharges, releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"Environmental Permits" means any environmental permits, license approval, consent, or authorization issued by federal, state or local government or regulatory entity, to the extent related to the Assets.

"Hazardous Materials" means any chemicals, pollutants, contaminants, wastes and toxic substances, including: (A) the presence of which requires reporting, investigation, removal or remediation under any Environmental Law; (B) that is defined as a "hazardous waste," "hazardous substance," "hazardous material," "pollutant" or "toxic substance" under an Environmental Law; (C) that is toxic, explosive, corrosive, flammable, ignitable, infectious, radioactive, reactive, carcinogenic, mutagenic, or otherwise hazardous and is regulated as such under any Environmental Law; or (D) that contains gasoline or any other petroleum product or byproduct, polychlorinated biphenyls, asbestos and urea formaldehyde.

"Liabilities" means any claims, obligations, damages, actions, suits, Proceedings, demands, assessments, adjustments, penalties, losses, debts, costs and expenses and any other liabilities of any kind or nature whatsoever (including court costs, reasonable attorneys' and

expert witness fees and expenses, consulting fees and expenses of investigation), whether equitable or legal, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent, asserted or unasserted, liquidated or unliquidated, accrued or unaccrued or due or to become due, and expressly including punitive damages, consequential damages, treble damages and any damages as a result of or relating to a loss of profits.

"Permits" means any permits, grants, filings, notices of intent, exemptions, licenses, authorizations, registrations, franchises, consents, approvals and related applications of every kind from or with any federal, state local or foreign government or regulatory authorities or industrial bodies, to the extent related to the Facility Assets.

"Proceedings" means any claim, investigation, litigation, action, suit or proceeding, formal arbitration, informal arbitration or mediation, administrative, judicial or otherwise.

"Release" means release, spill, leak, discharge, dispose of, pump, pour, emit, empty, inject, leach, dump or allow to escape into or through the environment.

"Seller Material Adverse Effect" means any effect, event, liability, circumstance, occurrence or change that, individually or in the aggregate, has or is reasonably likely to have a material adverse effect on the business, results of operations or financial condition of Facility Assets, taken as a whole, other than effects, events or changes arising out of or resulting from (a) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (b) changes in general legal, regulatory, political, economic or business conditions or changes in generally accepted accounting principles that, in each case, generally affect industries in which the Seller conducts business, (c) the negotiation, execution, announcement or performance of this Agreement or the consummation of the transactions contemplated hereby, including the impact thereof on relationships, contractual or otherwise, with customers, suppliers, lenders, partners or employees, (d) acts of war, sabotage or terrorism, or any escalation or worsening of any such acts of war, sabotage or terrorism threatened or underway as of the date of this Agreement or (e) earthquakes, hurricanes or other natural disasters, but only to the extent any such effect, event or change described in clauses (a) through (e) do not materially disproportionately impact Seller or the Facility Assets.

ARTICLE 12.  GENERAL PROVISIONS

12.1.  Assignability; No Third Party Rights.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns. Notwithstanding the foregoing, no party may assign its rights or obligations under this Agreement without prior written consent of the other party, which consent shall not be unreasonably withheld, delayed, or conditioned; provided, however, that Buyer may assign and delegate its rights and obligations under this Agreement to a party that controls, or is controlled by, or is under common control with, Buyer, and qualified under applicable FCC rules, upon notice to, but not the prior written consent of, Licensee. The covenants, conditions and provisions hereof are and shall be for the exclusive benefit of the parties hereto and their permitted assigns, and nothing herein, express or implied, is intended or shall be construed to confer upon or to give any person or entity other than the parties hereto and their permitted assigns any right, remedy or claim, legal or equitable, under or by reason of this Agreement.

12.2.   Amendments; Waivers.   The terms, covenants, representations, warranties and conditions of this Agreement may be changed, amended, modified, waived, or terminated only by a written instrument executed by the party waiving compliance. The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right of such party at a later date to enforce the same. No waiver by any party of any condition or the breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.3.   Notices.   All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (which shall include notice by telex or facsimile transmission) and shall be deemed to have been duly made and received when personally served, or when delivered by Federal Express or a similar overnight courier service, expenses prepaid, or, if sent by telex, graphic scanning or other facsimile communications equipment, delivered by such equipment, addressed as set forth below:

(a)   if to Seller, then to:              Rustick, LLC
                                          _____
                                          _____
                                          Attention:
                                          Facsimile No.:

      with copies to:

(b)   if to Buyer, then to:               _____
                                          _____
                                          _____
                                          Attention:
                                          Facsimile No.:

      with copies to:

Any party may alter the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section providing for the giving of notice.

12.4.   Captions.   The captions of Articles and Sections of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

12.5.   Governing Law.   This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the State of Pennsylvania, without giving effect to principles of conflicts of laws.

12.6.   Entire Agreement.   This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all

24

prior agreements, understandings, inducements or conditions, express or implied, oral or written, relating to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of trade inconsistent with any of the terms hereof.  This Agreement has been prepared by all of the parties hereto, and no inference of ambiguity against the drafter of a document therefore applies against any party hereto.

      12.7.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

[SIGNATURE PAGE FOLLOWS]

873328_3

<u>SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT</u>

       IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

BUYER:

By: _____
       Name:
       Title:

By: _____
       Name:
       Title: President

SELLER:               RUSTICK, LLC
By: _____
       Name:
       Title:

**SCHEDULES**

1.1(a)-Real Property
1.1(b)-Tangible Personal Property
1.1(c)(i)-Environmental Permits
1.1(c)(ii)-Permits
1.1(d)-Contracts
1.1(e)-Intangible Personal Property
1.2(h)-Excluded Contracts
1.3(c)-Assumed Contracts
2.4-Exceptions to Permits
2.5-Required Approvals
2.8- Environmental Compliance
2.10-Employment Agreements
2.11-Litigation
2.13-Broker

**Schedule 1.1(a)**
**Real Property**

1. Fee simple interest in real estate located in the Township of Sargeant, County of McKean, Commonwealth of Pennsylvania.

2. Lessee under real estate lease agreement with first right of refusal to purchase with P.J. Murphy Forest Products Corporation.

3. Purchaser under land purchase option agreement for future option to purchase of property with RAM Forest Products, Inc.

4. Lease Agreement with Girl Scouts of Western PA and Option Purchase Agreement.

**Schedule 1.1(b)**
**Tangible Personal Property**

**To be supplied**

**Schedule 1.1(c)(i)**
**Environmental Permits**

1. Joint Permit Application - Wetlands Permit - November 2008

2. Major Permit Modification - Tonnage Increase & Western Expansion, Phase II, Vol. I

3. Major Permit Modification - Tonnage Increase & Western Expansion, Phase II, Vol. II

4. Permit Application, Railroad Transfer Station, Updated Thru May 2009

5. Tonnage Increase & Western Expansion, Phase I, Vol. I

6. Tonnage Increase & Western Expansion, Phase I, Vol. II

7. Rail Permit - Modification for Solid Waste Disposal or Processing Permit

8. Highway Occupancy Permit

9. Transfer of Permit and Submerged Lands License Agreement

10. Permit for Solid Waste Disposal or Processing Permit

11. Western Expansion Permit

12. Water Obstruction and Encroachment

873328_3

**Schedule 1.1(c)(ii)**
**Permits**

**To Be Supplied**

Rustick, LLC
Case No. 10-10902 TPA
**List of Executory Contracts and Unexpired Leases**

| Name and Mailing Address of Party | Contract Description | Contract Date | Cure Amount as of October 21, 2010 | Description of Ongoing Obligation |
|---|---|---|---|---|
| Acme Business Machines P.O. Box 284 313 W. State Street Olean, NY 14760-0284 | Lease of a Copier | 1/01/2010 | $89.58 | $89.58 per month rental payment |
| Caterpillar Financial Services Corp. 2120 West End Avenue Nashville, TN 37203 | Lease of Caterpillar 826H Landfill Compactor S/N AWF00307 (UCC Filed @ 2006031000607) | 3/21/2006 | $22,197.58 | $8,830.66 per month rental payment |
| Evergreen National Indemnity Co. 6140 Parkland Blvd., #300 Cleveland, OH 44124 | Bonding, Indemnity, & Security Agreement | 6/1/2005 | $87,897.00 | $1.50 Per Ton that "crosses the scale" due on a quarterly basis |
| Ernharth & Associates, Inc. Wexford Professional Building 11676 Perry Highway #2301 Wexford, PA 15090 | Agreement to service 401(k) | 11/1/2007 | $895.00 | Annual Fee of $895.00 |

| | | | | |
|---|---|---|---|---|
| GE Capital<br>P.O. Box 64211<br>Pittsburgh, PA<br>15264-2111 | Lease of a Copier | 1/1/2010 | $0.00 | $67.80 per month rental payment |
| Girl Scouts of Western PA<br>30 Isabella Street, Suite 107<br>Pittsburgh, PA 15212 | Lease Agreement | 8/30/2005 | $15,000.00 | $5,000.00 per month rental payment |
| Girl Scouts of Western PA<br>30 Isabella Street, Suite 107<br>Pittsburgh, PA 15212 | Reaffirmation & Extensions of Option, as Amended and all related Agreements | 10/2/2006, Amended 12/31/2009 | $11,325.64 | $.30 Per Ton that "crosses the scale" due on a quarterly basis |
| GM Equipment Corp.<br>1229 Million Dollar Highway<br>Kersey, PA 15846 | Lease of a 2000 Ford 750 Water Truck | 11/20/2006 | $0.00 | $1,590.00 per month rental payment |
| Great American Leasing Corp.<br>P.O. Box 609<br>Cedar Rapids, IA 52406 | Lease of Commercial Hot & Cold High Pressure Washer, Serial No. 197637 | 6/8/2006 | $176.23 | $148.67 per month rental payment |
| Great American Leasing Corp.<br>P.O. Box 609<br>Cedar Rapids, IA 52406 | Lease of a 2007 Terex TC-35 Mini Excavator, Serial No. TC00350162 | 4/15/2008 | $1,004.12 | $907.88 per month rental payment |
| Hasler, Inc.<br>P.O. Box 3808<br>Milford, CT 06460-7808 | Lease of a Postage Meter | 2009 | $44.47 | $44.47 per month rental payment |

| | | | | |
|---|---|---|---|---|
| J&J Honeydipping 1063 Lafferty Lane Bradford, PA 16701 | Concentrate Hauling Agreement; Back-up service to haul leachate concentrate to Jamestown | 5/1/2009 | $2,410.00 | $360.00 fee per load hauled |
| James E. Hennigan P.O. Box 309 3 Keesler Avenue Mount Jewett, PA 16740 | Concentrate Hauling Agreement to haul concentrate to Jamestown | 5/9/2009 | $7,909.20 | $.09 per gallon for each gallon hauled |
| McKean County Solid Waste Authority 19 Ness Lane Kane, PA 16735 | Asset Purchase Agreement and Agreement to Assign & Assume Collateral Rights (McKean County is also a party to the Agreement to Assign.) | 12/22/1994 | $55,628.71 | N/A |
| McKean County c/of Daniel J. Hartle, Esquire McKean County Solicitor 3rd Floor, 78 Main Street Bradford, PA 16701 | Agreement to Assign & Assume Collateral Rights (McKean County Solid Waste Authority is also a party to this Agreement.) | 12/22/1994 | $0.00 | N/A |
| Michael Manderfeld 75 Owens Road Warren, PA 16365 | Employment Agreement | 6/1/2008 | $0.00 | $350.00 per month |

873328_3

| | | | | |
|---|---|---|---|---|
| P.J. Murphy Forest Products Corp. P.O. Box 300 Montville, NJ 07045 | Real Estate Lease Agreement w/ Right of First Refusal | 2/1/2008 | $0.00 | N/A |
| Paychex 33 Dodge Road Suite 101 Getzville, NY 14068 | Agreement for the Provision of Payroll Service | 2/1/2007 | $0.00 | Average cost of $300.00 to $400.00 per month |
| RAM Forest Products, Inc. HCR 1, Box 15-A ATTENTION: Paul J. Westerburg Shinglehouse, PA 16748 | Land Purchase Option Agreement | 10/1/2006 | $0.00 | This agreement is set to expire on October 1, 2010, however, the Debtor hopes to negotiate a brief extension. Past agreements called for $15,000.00 to be paid per year, which was applied to the purchase price of the land. |
| Rochem Membrane Systems 300 Manhattan Beach Blvd. #4 Manhattan Beach, CA 90266 | Service Agreement for Leachate Treatment Plan (Operational inspection by third party pursuant to Pa. Dept. of Environmental Protection Permit Requirement.) | 10/1/2009 | $3,200.00 | $3,200.00 cost per visit |

| | | | | |
|---|---|---|---|---|
| Sergeant Township 14200 Wilcox Road Mount Jewett, PA 16740 | Host Agreement | 8/2/2006 | $0.00 | $1.00 host fee per Ton that "crosses the scale" due on a quarterly basis |
| Smethport Area School District ATTENTION: Sue Jordan 414 S. Mechanics Street Smethport, PA 16749 | Stipulation to Settle; Payments in Lieu of Real Estate Tax (Sergeant Township & McKean County are also bound by this Stipulation.) | 1/1/2006 | $7,260.63 | $.25 Per Ton that "crosses the scale" due on a quarterly basis |
| Sergeant Township 14200 Wilcox Road Mount Jewett, PA 16740 | Stipulation to Settle; Payments in Lieu of Real Estate Tax (Smethport Area School District and McKean County are also bound by this Stipulation.) | 1/1/2006 | $0.00 | N/A |
| McKean County c/of Daniel J. Hartle, Esquire McKean County Solicitor 3rd Floor, 78 Main Street Bradford, PA 16701 | Stipulation to Settlement; Payments in Lieu of Real Estate Tax (Smethport Area School District and Sergeant Township are also bound by this Stipulation.) | 1/1/2006 | $0.00 | N/A |

873328_3

| | | | | |
|---|---|---|---|---|
| Veolia ES Solid Waste of PA<br>P.O. Box 6484<br>Carol Stream, IL  60197 | Agreement for Medical Waste Disposal | 12/1/2007 | $8.88 | N/A |
| Wild Blue Communications, Inc.<br>ATTENTION:  EBP<br>P.O. Box 4427<br>Englewood, CO  80155 | Internet Service Contract | 2007 | $0.00 | $79.95 due per month |

**Insurance Agreements**

| Name and Mailing Address of Party | Contract Description | Contract Date | Cure Amount as of August 15, 2010 | Description of Ongoing Obligation |
|---|---|---|---|---|
| AFLAC<br>Remittance Processing Service<br>1932 Wynnton Road<br>Columbus, GA 31999 | Long-Term Disability Insurance | 2006 | $0.00 | $109.66 per month |
| Chartis<br>22427 Network Place<br>Chicago, IL  60673-1224 | Worker's Compensation Insurance | 8/30/2009 | $0.00 | $4,923.00 per month |
| Fireman's Fund Insurance Co.<br>Dept. CH  10284<br>Palatine, IL  60055 | Liability Insurance | | $0.00 | Three installments of $3,312.50;  An installment of $3,312.50 is due on October 21, 2010 |

7

| | | | | |
|---|---|---|---|---|
| Harleysville Life Insurance Co. 1400 Pennbrook Parkway Lansdale, PA 16944 | Life Insurance | 2/1/2006 | $0.00 | $60.90 per month |
| Highmark Blue Shield P.O. Box 382146 Pittsburgh, PA 15250 | Health & Vision Insurance | | $0.00 | $7,093.47 per month |
| MetLife P.O. Box 804466 Kansas City, MO 64180-4446 | Dental Insurance | 2009 | $0.00 | $607.14 per month |
| Premium Financing Specialists P.O. Box 13454 Newark, NJ 07188 | Pollution and Auto Insurance | 8/31/2009 | $3,059.97 | N/A |
| Selective Insurance Box 371468 Pittsburgh, PA 15250 | Liability Insurance | 8/30/2009 | $307.84 | $1,671.00 per month |
| Sundahl & Company Insurance 58 Derrick Road P.O. Box 368 Bradford, PA 16701 | Insurance Agent | 2005 | N/A | N/A |

873328_3

**Schedule 1.1(e)**
**Intangible Personal Property**


**None**

873328_3

**Schedule 1.2(h)**
**Excluded Contracts**

**To be provided by Buyer**

10

**Schedule 1.3(c)**
**Assumed Contracts**

**To be supplied by Buyer**

11

**Schedule 2.4**
**Exceptions to Permits**

**To be supplied**

12

Schedule 2.5

**Required Approvals**

**To be supplied**

**Schedule 2.8**
**Environmental Compliance**

**Notice of Violation From Pennsylvania Department of Environmental Protection, Warren District Office, dated June 11, 2010. The text of the Notice of Violation is attached.**

873328_3

**Pennsylvania**
Department of Environmental Protection
Warren District Office

June 11, 2010

<u>NOTICE OF VIOLATION</u>

Mr. Richard Godshall
President
Rustick LLC
19 Ness Lane
Kane, PA 16735

Re:    Bonding Requirements
        McKean County Landfill
        Waste Management Permit No. 100361
        Sergeant Twp., McKean County

Dear Mr. Godshall:

As of the date of this correspondence, Rustick LLC has failed to make the required phased deposits to the surety bonds required for operation of the McKean County Landfill. Failure to make the required deposits is a violation of 25 Pa. Code §271.326(a)(3). The deposits were required to have been made by May 23, 2010, in accordance with the Phased Deposit Endorsements and Schedules for Deposit executed on May 23, 2009.

This Notice of Violation is neither an order nor any other final action of the Department of Environmental Protection. It neither imposes nor waives any enforcement action available to the Department under any of its statutes. If the Department determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions concerning this matter, please contact me at the above address or telephone number.

Sincerely,


Richard A. Sheriff
Solid Waste Specialist

                        Waste Management Program

873328_3

**Schedule 2.10**
**Employment Agreements**

1. Employment Agreement with Michael Manderfeld

873328_3

**Schedule 2.11**
**Litigation**

1. M.L. Lyon, Inc. and Maria Casey vs. Rustick, LLC, Randall M. Hendricks, Richard L. Godshall, Merrill Lynch & Co., Edward Curland, and Bank of America, No. S-1726-2009. Court of Common Pleas of Schuylkill County, Pennsylvania. This case was dismssed in regards to Rustick, LLC, Randall M. Hendricks and Richard L. Godshall on December 28, 2009.

**Schedule 2.13**
**Broker**

1.  Sterner Consulting
    19 Waterfront Drive
    Pittsburgh, PA  15222