UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | : |
| RUSTICK, LLC, | : BANKRUPTCY NO. 10-10902 TPA |
| Debtor. | : |
| | : THE HONORABLE THOMAS P. AGRESTI |
| RUSTICK, LLC, | : |
| | : CHAPTER 11 |
| Movant, | : |
| | : RELATED TO DOCUMENT NOS. 251 & 289 |
| v. | : |
| | : |
| MERRILL LYNCH PORTFOLIO MANAGEMENT, | : |
| INC.; MERRILL LYNCH PIERCE FENNDER & | : |
| SMITH INCORPORATED; and THE BANK OF NEW | : |
| YORK MELLON TRUST COMPANY, N.A., as | : |
| successor to J.P. Morgan Trust Company, National | : |
| Association; ROSALIE BISHOP, TAX COLLECTOR; | : |
| GREAT AMERICAN LEASING CORP.; | : |
| CATERPILLAR FINANCIAL SERVICES CORP.; | : |
| EVERGREEN NATIONAL INDEMNITY COMPANY; | : |
| and SMETHPORT AREA SCHOOL DISTRICT, | : |
| | : |
| Respondents. | : |
| | : |
| | : |
| | : |
| | : |

**Asset Purchase Agreement**

Please find attached the Asset Purchase Agreement between Casella Waste Systems, Inc. and Rustick, LLC.

Respectfully submitted,

QUINN, BUSECK, LEEMHUIS, TOOHEY & KROTO, INC.

BY:  /s/Lawrence C. Bolla
Lawrence C. Bolla, Esquire
PA Id. No. 19679
2222 West Grandview Boulevard
Erie, Pennsylvania 16506-4508
Telephone: 814-833-2222
Facsimile: 814-833-6753
E-Mail: lbolla@quinnfirm.com
Counsel for Debtor

Document #538032, v1

# ASSET PURCHASE AGREEMENT

DATED AS OF OCTOBER 14, 2010

between

RUSTICK, LLC

and

CASELLA WASTE SYSTEMS, INC.

# TABLE OF CONTENTS

ARTICLE 1. SALE AND PURCHASE ........................................................................................2
   1.1.   Facility Assets ............................................................................................2
   1.2.   Excluded Assets .........................................................................................3
   1.3.   Liabilities. ..................................................................................................5
   1.4.   Purchase Price. ..........................................................................................6
   1.5.   Adjustments ...............................................................................................7
   1.6.   Closing .......................................................................................................7
   1.7.   Third-Party Consents .................................................................................7
ARTICLE 2. REPRESENTATIONS AND WARRANTIES OF SELLER .............................8
   2.1.   Status ..........................................................................................................8
   2.2.   Authority ....................................................................................................8
   2.3.   No Conflict. ................................................................................................8
   2.4.   Permits .......................................................................................................8
   2.5.   Approvals and Consents .............................................................................9
   2.6.   Sufficiency of and Title to Facility Assets ................................................9
   2.7.   Real Property. .............................................................................................9
   2.8.   Environmental Matters. ............................................................................10
   2.9.   Compliance with Law. ..............................................................................11
   2.10.   Employment Matters. ...............................................................................11
   2.11.   Litigation ..................................................................................................12
   2.12.   Tangible Personal Property; Intangible Property .....................................12
   2.13.   Brokers .....................................................................................................13
   2.14.   Financial Matters. ....................................................................................13
   2.15.   Contracts ..................................................................................................13
   2.16.   Absence of Material Change ....................................................................13
   2.17.   Affiliates ..................................................................................................14
   2.18.   Disclosure ................................................................................................14
ARTICLE 3. REPRESENTATIONS AND WARRANTIES OF BUYER ...............................14
   3.1.   Status ........................................................................................................14
   3.2.   Authority ..................................................................................................14
   3.3.   No Conflicts .............................................................................................14
   3.4.   Brokers .....................................................................................................15
   3.5.   Approvals and Consents ...........................................................................15
ARTICLE 4. COVENANTS OF SELLER ...............................................................................15
   4.1.   Operation of the Business. ........................................................................15
   4.2.   Access to Facilities, Files and Records. ...................................................16
   4.3.   Consents. ..................................................................................................16
   4.4.   Notice of Proceedings ...............................................................................17
   4.5.   Consummation of Agreement ...................................................................17
   4.6.   Representations and Warranties ...............................................................17
   4.7.   Employee Matters. ...................................................................................17
ARTICLE 5. COVENANTS OF BUYER .................................................................................18
   5.1.   Representations and Warranties ...............................................................18
   5.2.   Consummation of Agreement ...................................................................18
   5.3.   Notice of Proceedings ...............................................................................18

| | | |
|---|---|---|
| 5.4. | Consents. | 18 |
| 5.5 | Financial Condition | 18 |
| ARTICLE 6. AGREEMENTS OF SELLER AND BUYER. | | 19 |
| 6.1. | Certain Other Matters | 19 |
| 6.2. | Confidentiality. | 19 |
| ARTICLE 7. CONDITIONS TO THE OBLIGATIONS OF SELLER | | 21 |
| 7.1. | Representations, Warranties and Covenants. | 21 |
| 7.2. | Proceedings. | 21 |
| 7.3. | DEP Consent | 21 |
| 7.4. | Deliveries | 21 |
| 7.5. | Bankruptcy Court Approval | 21 |
| 7.6. | Release of Funds | 21 |
| ARTICLE 8. CONDITIONS TO THE OBLIGATIONS OF BUYER | | 22 |
| 8.1. | Representations, Warranties and Covenants. | 22 |
| 8.2. | Proceedings. | 22 |
| 8.3. | Deliveries | 22 |
| 8.4. | Required Consents | 22 |
| 8.5. | Bankruptcy Court Approval | 23 |
| 8.6. | Contracts. | 23 |
| ARTICLE 9. ITEMS TO BE DELIVERED AT THE CLOSING | | 23 |
| 9.1. | Deliveries by Seller | 23 |
| 9.2. | Deliveries by Buyer | 24 |
| ARTICLE 10. MISCELLANEOUS | | 24 |
| 10.1. | Termination | 24 |
| 10.2. | Expenses | 25 |
| 10.3. | Remedies Cumulative | 25 |
| 10.4. | Further Assurances | 25 |
| 10.5. | Public Announcements. | 25 |
| 10.6. | Risk of Loss | 25 |
| ARTICLE 11. DEFINITIONS | | 26 |
| ARTICLE 12. GENERAL PROVISIONS | | 27 |
| 12.1. | Assignability; No Third Party Rights | 27 |
| 12.2. | Amendments; Waivers | 28 |
| 12.3. | No Personal Liability | 28 |
| 12.4. | Notices | 28 |
| 12.5. | Captions | 29 |
| 12.6. | Governing Law | 29 |
| 12.7. | Entire Agreement | 29 |
| 12.8. | Counterparts | 29 |

ii

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of October 14, 2010 between Rustick, LLC, debtor and debtor-in-possession ("Seller") and Casella Waste Systems, Inc. ("Buyer").

Recitals

A.    Seller owns and operates a solid waste disposal facility in Sergeant Township, McKean County, Pennsylvania and other tangible and intangible assets and properties used or  in connection therewith ("Facility"). The business and operations currently conducted by Seller at the Facility are referred to herein collectively as the "Business". The terms "Facility" and "Business" as used herein do not include the expansion of the Facility to include approximately 30,164,800 cubic yards of additional capacity and a proposed rail unloading facility (the "Western Expansion").

B.    On May 13, 2010, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the U.S. Bankruptcy Court in the Western District of Pennsylvania (the "Bankruptcy Court"). Seller continues to manage its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    On July 22, 2010, the Seller filed its Motion for an Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets of Debtor; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief (the "Bid Procedures Motion"), and the Bankruptcy Court entered an Order approving such bid procedures on August 18, 2010 (the "Bid Procedures Order").

D.    On August 9, 2010, Seller filed its First Amended Plan of Reorganization (as may be amended, the "Plan"), which contemplates that the Plan will be funded through a sale of substantially all of the Seller's assets.

E.    Subject to approval of the Bankruptcy Court and the terms and conditions set forth herein, Seller desires to sell and assign to Buyer, and Buyer desires to acquire from Seller, the Facility Assets (hereinafter defined).

F.    The Facility Assets will be sold under, pursuant to, and in accordance with, the Plan and the Order of the Bankruptcy Court (the "Confirmation Order"), confirming a plan of reorganization, authorizing and approving the sale of the Facility Assets and the assumption and assignment of the Assumed Contracts (as hereinafter defined) pursuant to Section 365 of the Bankruptcy Code in accordance with the terms and conditions of this Agreement.

<u>Agreement</u>

NOW, THEREFORE, taking the foregoing into account, and in consideration of the mutual covenants and agreements set forth herein, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE 1. <u>SALE AND PURCHASE</u>

1.1.    <u>Facility Assets</u>.  Subject to and in reliance upon the representations, warranties and agreements herein set forth, and subject to the terms and conditions herein contained, Seller shall grant, convey, sell, assign, transfer and deliver to Buyer on the Closing Date (as hereinafter defined) all interests of Seller in all properties, assets, privileges, rights, interests and claims, real and personal, tangible and intangible, of every type and description, wherever located, including its business and goodwill (except for Excluded Assets as defined in Section 1.2) used or held for use in the Business (collectively, the "Facility Assets").  Without limiting the foregoing, the Facility Assets shall include the following:

(a)    <u>Real Property</u>.  All interests of Seller in all land, leaseholds, licenses, rights-of-way and other interests of every kind and description in and to all of the real property and all buildings and fixtures (including without limitation leachate treatment and other systems) thereon, used or held for use in the Business, including without limitation those listed and described on <u>Schedule 1.1(a)</u> attached hereto (collectively, the "Real Property");

(b)    <u>Tangible Personal Property</u>.  All interests of Seller in all equipment, office equipment and supplies, vehicles, inventory of supplies, spare parts, and other tangible personal property of every kind and description, used or held for use in connection with the Business, including without limitation those listed and described on <u>Schedule 1.1(b)</u> attached hereto, and any additions and improvements thereto (collectively, the "Tangible Personal Property"), but excluding Tangible Personal Property constituting Excluded Assets;

(c)    <u>Environmental Permits; Permits</u>.  (i) All Environmental Permits related to the ownership, operation, management or use of the Facility or to the Western Expansion or the conduct of the Business that are owned by, issued to, or held by or otherwise benefiting Seller and are transferable or may be reissued by their respective terms to Buyer (with or without consent or other action by the issuing authority), including without limitation those listed and described on <u>Schedule 1.1(c)(i)</u> attached hereto; and (ii) all other Permits related to the ownership, operation, management or use of the Facility or the conduct of the Business or to the Western Expansion that are owned by, issued to, or held by or otherwise benefiting Seller and are transferable or may be reissued by their respective terms to Buyer (with or without consent or other action by the issuing authority), including without limitation those listed and described on <u>Schedule 1.1(c)(ii)</u> attached hereto;

(d)    <u>Contracts</u>.  All rights of Seller in those Contracts (other than the Excluded Contracts) to which Seller is a party and which have a term that extends beyond the Closing Date and are used in connection with the Business that are listed on <u>Schedule 1.1(d)</u> as being eligible for sale and assignment, and the purchase option granted to Seller by Caterpillar Financial

Services Corporation pursuant to paragraph 2(g) of that Amended Stipulation dated September 3, 2010 (the "Assumed Contracts");

(e)      Intangible Property. All interests of Seller in all trademarks, trade names, service marks, copyrights, franchises, patents, jingles, slogans, logotypes, domain names and other intangible rights, used or held for use in connection with the Business, including without limitation those listed and described on Schedule 1.1(e) attached hereto (collectively, the "Intangible Property"), but excluding any Intangible Personal Property constituting Excluded Assets;

(f)      Files and Records. All of the operating records, customer records, maintenance files, engineering studies, plan and specifications of Seller to the extent related to the Business or any Facility Assets (in whatever format they exist, whether in hard copy or electronic format) and to the extent transferable under applicable law, human resources records, employee personnel files (including all employee benefit files and employee investigation files, if applicable and related files (collectively, "Employee Records") related to employees of Seller, but excluding any files, documents, books and records that constitute Excluded Assets (collectively, "Records"); provided, however, that Seller may retain copies of all Employee Records and all other Records transferred to Buyer pursuant to this Section to the extent needed to comply with any regulations, investigations, audits or inquiries or for ongoing matters relating to the Excluded Assets ("Duplicate Records");

(g)      Prepaid Items. All deposits, reserves, prepaid expenses and prepaid taxes relating to the Facility, the Facility Assets or the Business;

(h)      Goodwill. All of Seller's goodwill in, and going concern value of, the Facility, the Facility Assets or the Business;

(i)      Accounts Receivable. All accounts receivable of the Business, including any notes or written obligations evidencing such accounts receivable, in each case as of the Closing Date (the "Receivables"); and

(j)      Warranty Claims. All Contracts and claims, rights, and interests of Seller against third parties under manufacturers', contractors' and vendors' warranties, if and to the extent that they relate to the Facility Assets.

1.2.      Excluded Assets. Each of the following assets shall be excluded from the Facility Assets and retained by Seller, to the extent in existence on the Closing Date (the "Excluded Assets"):

(a)      Cash. Cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), commercial paper, certificates of deposit and other bank deposits, treasury bills and other cash equivalents;

(b)      Insurance. All rights under any insurance policies of Seller, including any cash surrender value under any such insurance policies; provided, that if and to the extent that any of such insurance policies cover any Assumed Liabilities, the right to coverage under such

policies in respect of such Assumed Liabilities shall, to the extent permissible under such policies, shall be included in the Facility Assets;

(c) <u>Tax Refunds</u>. All refunds or credits, if any, of Taxes. "Taxes" means any federal, state, local or non-U.S. net income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, value-added, ad valorem, transfer, franchise, capital, paid-up capital, profits, lease, service, greenmail, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, customs duty or other taxes, governmental fees or other like assessment or charges of any kind whatsoever (including any Liability for Taxes incurred or borne as a transferee or successor or by contract, or otherwise), together with any interest or any penalty, addition to taxes or additional amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such taxes;

(d) <u>Collateral Account</u>. Seller's rights in the collateral account maintained by Evergreen National Indemnity Company;

(e) <u>Excluded Books and Records and Securities</u>. The minute books, stock transfer books and corporate seal of the Seller, taxpayer and other identification numbers, tax records, and any securities issued by the Seller and its subsidiaries, if any;

(f) <u>Litigation Claims; Avoidance Actions</u>. Any and all actions, causes of action, rights (including indemnification), claims, or recoveries of the Seller against third parties arising out of or relating to events prior to the Closing Date (excluding claims referenced in Section 1.1(j) hereof and any claims under insurance policies included in the Facility Assets), including but not limited to Seller's claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions;

(g) <u>Rights Hereunder</u>. Seller's rights under this Agreement;

(h) <u>Excluded Contracts</u>. The specific Contracts designated by Buyer and described in <u>Schedule 1.2(h)</u> and any other Contracts that are not listed on <u>Schedule 1.1(d)</u>, including without limitation Contracts that constitute, or exclusively relate to, any Excluded Asset or Excluded Liability (the "Excluded Contracts"), and all rights and obligations thereunder;

(i) <u>Certain Records</u>. Those records of Seller to the extent exclusively related to any Excluded Assets (including files related to Taxes and personnel files) and Duplicate Records; and

(j) <u>Western Expansion</u>. The assets of Seller relating to the Western Expansion which are listed on <u>Schedule 1.2(j)</u>, including all engineering studies relating to the Western Expansion;

(k) <u>Rail-related Assets</u>. All assets of the Seller related to the construction of a rail spur at the Facility, including but not limited to rail track, switches and any related inventory associated with such construction, but excluding the associated permit issued by the

Pennsylvania Department of Environmental Protection (the "DEP"), Solid Waste Management Permit No. 101694 (the "Rail Permit"), which shall be a Facility Asset;

(l) _Employee Benefit Plans_. All employee benefit plans maintained by Seller for the benefit of any of its past or current employees, and all related trusts and Contracts; and

(m) _Employee/Consulting Relationships_. All relationships between Seller and any employee or consultant and all related Contracts.

1.3. _Liabilities_.

(a) The Facility Assets shall be sold and conveyed to Buyer free and clear of (A) all mortgages, liens, deeds of trust, security interests, pledges of those parties listed as Respondents in the _Motion of the Debtor for Order Authorizing the Sale of Substantially All of the Debtor's Assets as Part of the Debtor's Plan of Reorganization_ (the "Motion") that was filed with the Bankruptcy Court on September 7, 2010 and is docketed at Document No. 289 in the Seller's bankruptcy case, and (B) all other restrictions, prior assignments, charges, interests and claims (as defined in section 101(5) of the Bankruptcy Code, including without limitation successor liability claims and claims relating to the Excluded Assets and Excluded Liabilities), defects in title and encumbrances of any kind or type whatsoever (collectively, "Liens") except: (i) liens for real estate taxes, assessments, water and sewer rents and similar charges not yet due and payable for which Buyer receives a Purchase Price adjustment under Section 1.5; (ii) zoning ordinances and regulations which do not materially adversely affect the use, value or marketability of the Real Property for its current uses; (iii) easements, rights of way, servitudes, restrictions and other minor defects and irregularities in title to the Real Property that do not materially adversely impair the use, value or marketability of the Real Property for its current uses; and (iv) the post-Closing obligations of Seller which Buyer will assume under the Assumed Contracts assigned to Buyer that are listed on Schedule 1.1(d) ("Permitted Encumbrances"). For the avoidance of doubt, except to the extent that the same are specifically set forth in the Assumed Contracts, Permitted Encumbrances do not include (A) any requirement that the owner or lessee of the Real Property pay any tipping fee or other royalty in connection with waste disposed of thereon, or accept waste for disposal from any Person, (B) any limitation on the fee that can be charged for the disposal of waste on the Real Property, or (C) any requirement that the owner or lessee of the Real Property pay to any Person any amounts which are unrelated to the Real Property or its business as conducted thereon.

(b) Buyer expressly assumes any and all Liabilities relating to the Facility Assets (but not to any Excluded Assets) arising under Environmental Laws and Environmental Permits whether such Liabilities relate to periods preceding or following the Closing, including all closure/post-closure Liabilities with respect to the Facility Assets (including such Environmental Permits) and any obligations under Laws (including Environmental Laws) to establish accruals for such Liabilities, but excluding any fines, penalties or payments arising out of matters referred to in the Notices of Violation from the DEP listed on Schedule 2.8 (or any similar notices that are received by Seller prior to Closing), including in connection with Seller's failure to maintain any bonds required under Environmental Permits..

(c)     With respect to the Assumed Contracts, Buyer expressly assumes (i) the cure amount, if any, for each such Assumed Contract as set forth on Schedule 1.1(d) (each a "Cure Amount") and (ii) all Liabilities relating to or arising out of the Assumed Contracts from and after the Closing Date. Subject to Section 8.5, at Closing, Buyer shall be required to provide adequate assurance of future performance with respect to the Assumed Contracts.

(d)     The Liabilities which are expressly assumed by Buyer pursuant to subsections (a), (b) and (c) above are referred to herein collectively as the "Assumed Liabilities". Buyer shall not assume or be liable for, and does not undertake to assume or discharge any other Liability of Seller or which relate to the Facility, the Facility Assets or the Business (collectively, the "Excluded Liabilities") including without limitation the following:  (i) any Liability or obligation of Seller arising out of or relating to any Excluded Asset; (ii) any Liability arising out of or relating to any employee benefit plan for which Seller is liable, or otherwise relating to the employment or engagement of any past or present employee or consultant of Seller; (iii) any Liability arising out of or relating to any Proceeding (including without limitation all Proceedings relating to Tax Liabilities) involving Seller, the Facility, the Facility Assets or the Business (whether or not such Proceeding is pending, threatened or asserted before, on or after the Closing Date), but only to the extent such Proceeding arises from an action or incident occurring before the Closing Date; (iv) any amount payable to any broker, finder or other person entitled to a commission or brokerage fee or payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement of, or action taken by, Seller, including without limitation Sterner Consulting; or (v) any other Liabilities of Seller, the Facility, the Facility Assets or the Business whatsoever, whether accrued now or hereafter, whether fixed or contingent, whether known or unknown.

(e)     Buyer shall pay, satisfy, discharge, perform and fulfill all Liabilities expressly assumed by Buyer hereunder as they become due, without any charge or cost to Seller, and Buyer agrees to indemnify and hold Seller and its successors and assigns harmless from and against any and all such Liabilities in accordance with the terms of Article 10 below.

1.4.    Purchase Price.

(a)     Purchase Price.  The purchase price to be paid for the Facility Assets will be an amount equal to the sum of (i) $500,000 (the "Purchase Price"), subject to adjustment in accordance with Section 1.5. The amount to be delivered to the Seller at Closing shall be equal to the Purchase Price minus (i) the Deposit (defined below), together with interest and earnings thereon, plus or minus (ii) the Closing Date Adjustments pursuant to Section 1.5 hereof.

(b)     Deposit.  Buyer deposited the principal amount of $100,000 (the "Deposit") with Seller on September 20, 2010. At Closing, Buyer shall receive against the Purchase Price a credit equal to the amount of the Deposit, together with all interest and earnings thereon. If this Agreement is terminated prior to the Closing, the Deposit shall be handled as provided in Section 10.1 hereof.

(c)     Method of Payment.    Upon Closing, the amount to be paid under subsection (a) above shall be paid by Buyer in immediately available funds pursuant to written

instructions of the Seller to be delivered by Seller to Buyer at least four (4) business days prior to Closing.

(d)     Allocation of Purchase Price.  Buyer and Seller will allocate the Purchase Price in accordance with the respective fair market values of the Facility Assets and the goodwill being purchased and sold in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"). The allocation shall be determined by mutual agreement of the parties. Each of Buyer and Seller further agrees to file its federal income tax returns and its other tax returns reflecting such allocation.

1.5.    Adjustments.

The operation of the Facility and the income and normal operating expenses attributable thereto through the date immediately preceding the Closing Date (the "Adjustment Date") shall be for the account of Seller and thereafter for the account of Buyer, and, if any income or expense is properly allocable or credited, then it shall be allocated, charged or prorated accordingly. Expenses for goods or services received both before and after the Adjustment Date, power and utilities charges, and prepaid and deferred items shall be prorated between Seller and Buyer as of the Adjustment Date in accordance with generally accepted accounting principles. All Taxes, special assessments, water and sewer rents and similar charges imposed against the Real Property and Tangible Personal Property in respect of any period of time through the Adjustment Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such Taxes, special assessments, water and sewer rents and similar charges in respect of any period of time after the Adjustment Date shall be the responsibility of Buyer, and such charges shall be prorated as required hereunder. To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Buyer and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within ninety (90) days after the Closing.

1.6.    Closing.  The consummation of the sale and purchase of the Facility Assets provided for in this Agreement (the "Closing") shall take place at the offices of Dilworth Paxson LLP, 1500 Market Street, Suite 3500E, Philadelphia, PA, at a date and time as the parties may mutually agree upon after the date that the Required Consents have been obtained, but in no event later than ten business days after the Required Consents have been obtained, subject to the satisfaction or waiver of the last of the conditions required to be satisfied or waived pursuant to Articles 7 or 8 below (other than those requiring a delivery of a certificate or other document, or the taking of other action, at the Closing). Alternatively, the Closing may take place at such other place, time or date as the parties may mutually agree upon in writing. The date on which the Closing occurs is referred to herein as the "Closing Date."

1.7.    Third-Party Consents.  Seller and Buyer acknowledge and agree that, in most cases, the Confirmation Order of the Bankruptcy Court authorizing and approving (a) the sale of the Facility Assets, and (b) the assumption, sale and assignment of the Assumed Contracts under Sections 363 and 365 of the Bankruptcy Code in accordance with the terms and conditions of this Agreement will authorize the assumption, sale and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto and will constitute an order holding unenforceable any anti-assignment or anti-alienation provision of all Assumed Contracts. Seller

and Buyer shall cooperate and use their best efforts in the presentation of evidence and seeking the entry of such an order. To the extent any Assumed Contract or Permit is not assumable, salable and assignable by Seller to Buyer under Sections 363 and 365 of the Bankruptcy Code without the consent of the parties thereto, Seller and Buyer shall make commercially reasonable efforts prior to Closing to obtain all required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without payment of money by or conditions materially adverse to Seller or Buyer). All such third-party consents shall be in writing and executed counterparts thereof shall be delivered to Buyer promptly after Seller's receipt thereof, but in no event later than two (2) business days prior to the Closing Date. Notwithstanding the foregoing or anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract or Permit or any claim or right or any benefit arising thereunder or resulting therefrom if (i) the term of the Assumed Contract or Permit has expired by its terms as of the Closing Date, or (ii) an attempted assignment thereof, without the consent of a third party thereto, would any way materially and adversely affect the rights of Buyer thereunder.

ARTICLE 2.  <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date:

2.1.  <u>Status</u>.  Seller is duly organized, validly existing and subsisting under the laws of the Commonwealth of Pennsylvania. Seller has the requisite power to carry on the Business as it is now being conducted and to own and operate the Facility and the Facility Assets, and Seller has the requisite power to enter into and complete the transactions contemplated by this Agreement. Seller has not used any name in the operation of the Business other than its name as first set forth above and Rustick, LLC, debtor-in-possession.

2.2.  <u>Authority</u>.  Subject to entry of the Confirmation Order, all limited liability company actions necessary to be taken by or on the part of Seller in connection with the transactions contemplated by this Agreement have been duly and validly taken, and this Agreement has been duly and validly authorized, executed, and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

2.3.  <u>No Conflict</u>.  Assuming that Seller obtains the Required Consents, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (a) violate Seller's organizational documents (correct and complete copies of which have been delivered to Buyer) or (b) violate any Laws applicable to Seller, the Facility, the Facility Assets or the Business.

2.4.  <u>Permits</u>.  The Permits listed on <u>Schedule 1.1(c)(ii),</u> when completed by Seller and delivered to Buyer as provided in Section 4.8 hereof, comprise all material Permits (excluding Environmental Permits) necessary to enable Seller to own and use the Facility Assets and conduct the Business. Seller is in compliance in all material respects with the terms and conditions of all such Permits (excluding Environmental Permits), and no proceedings are pending or, to Seller's knowledge, threatened that may result in the revocation, cancellation, suspension, limitation or adverse modification of any of the same. Except for matters that,

individually or in the aggregate, would not reasonably be expected to have a Seller Material Adverse Effect, there are no defects in any of such Permits. Such Permits are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated and have not expired.

2.5. <u>Approvals and Consents</u>. Except as described in <u>Schedule 2.5</u> hereto, as such Schedule is completed by Seller and delivered to Buyer as provided in Section 4.8 hereof, the execution, delivery and performance by Seller of this Agreement and the consummation by it of the transactions contemplated hereby will not require any consent, permit, license or approval of, or filing with or notice to, any person or entity, including without limitation any governmental or regulatory authority (each a "Person") under any provision of Law applicable to Seller, the Facility, the Facility Assets or the Business, or any Contract or Permit included in the Facility Assets.

2.6. <u>Sufficiency of and Title to Facility Assets</u>. Except as otherwise disclosed on <u>Schedule 2.6</u>, the Facility Assets constitute all of the assets necessary to conduct the Business. Except as otherwise disclosed on <u>Schedule 2.6</u>, Seller has (a) good and marketable title to all of the Facility Assets purported to be owned by it (which in the case of owned Real Property, includes fee simple title insurable by a reputable title company at ordinary rates) and (b) good leasehold title to all Facility Assets purported to be leased by it, in each case free and clear of all Liens, other than Permitted Encumbrances. On the Closing Date, Seller will transfer to Buyer title to the Facility Assets free and clear of all Liens, other than Permitted Encumbrances. All of the lienholders listed on <u>Schedule 2.6</u> are Respondents in the Motion.

2.7. <u>Real Property</u>.

(a) <u>Schedule 2.7(a)</u> sets forth a correct and complete list of (i) the Real Property and indicates whether such property is owned by Seller or leased by Seller, (ii) all leases, subleases and other material agreements or rights pursuant to which any Person has the right to occupy or use any Real Property owned or leased by Seller and (iii) all leases, subleases and other material agreements or rights pursuant to which Seller has the right to occupy or use any Real Property owned by others.

(b) All buildings and other improvements located on the Real Property, and the use of the Real Property by Seller, comply in all material respects with all Laws relating to zoning and land use and with all easements, covenants and other restrictions applicable to the Real Property. Seller's use of the Real Property does not require any special use permits, zoning variances or exceptions.

(c) The Real Property: (i) is adequately serviced by all utilities necessary for the conduct of the Business; (ii) has adequate means of ingress and egress, either directly or by means of perpetual easements or rights-of-way; and (iii) has adequate parking that is sufficient to meet the needs of Seller's employees and business invitees and to comply with applicable Laws.

(d) As of January 1, 2010, the landfill operated on the Real Property had approximately 3,573,000 cubic yards of capacity remaining. As of the date hereof, the Company

has recently completed construction of a one acre cell for the disposal of municipal solid waste having a capacity of 105,000 cubic yards as to which DEP approval is pending.

2.8.   Environmental Matters.

(a)   Except as described in Schedule 2.8:

(i)   all activities of the Facility and the Business, and of Seller with respect to the Facility, the Facility Assets and the Business have been and are being conducted in material compliance with all Environmental Laws and Environmental Permits, as well as all requirements of common law concerning those activities, repairs or construction of any improvements, manufacturing processing and/or handling of any materials, and discharges to the air, soil, surface water or groundwater;

(ii)   Seller has not generated, manufactured, refined, transported, stored, handled, disposed of or Released any Hazardous Material on the Real Property;

(iii)   Seller has obtained all approvals and caused all notifications to be made as required by Environmental Laws;

(iv)   the Environmental Permits listed on Schedule 2.8, as such Schedule is completed by Seller and delivered to Buyer as provided in Section 4.8 hereof, comprise all Environmental Permits necessary to enable Seller to own and use the Facility Assets and conduct the Business. Except as set forth on Schedule 2.8, Seller is in compliance in all material respects with the terms and conditions of all such Environmental Permits, and no proceedings are pending or, to Seller's knowledge, threatened that may result in the revocation, cancellation, suspension, limitation or adverse modification of any of the same. Except for matters that, individually or in the aggregate, would not reasonably be expected to have a Seller Material Adverse Effect, there are no defects in any of such Environmental Permits. Such Environmental Permits are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated and have not expired;

(v)   Seller has not received any notice of any violation by Seller of, or Liability or potential Liability of Seller under, any Environmental Laws, or any request for information from any governmental authority regarding the disposal of Hazardous Materials on the Real Property, the Release or threatened Release of Hazardous Materials at, on or under the Real Property or the compliance status or environmental condition of the Real Property;

(vi)   no Proceeding has been commenced or, to Seller's knowledge, threatened regarding Seller's compliance with any Environmental Laws or the presence of any Hazardous Material on or about the Real Property;

(vii)   to Seller's knowledge, no tanks used for the storage of any Hazardous Material above or below ground are, or at any time were, present on or about the Real Property;

(viii) no Hazardous Materials are present in any medium in the operations of the Facility (or of Seller with respect to the Facility), or in any medium at the Real Property, in such a manner as may require investigation or remediation under any applicable law;

(ix) Seller has no knowledge that any polychlorinated biphenyls or substances containing polychlorinated biphenyls are present on the Real Property;

(x) no friable asbestos is present in the operations of the Facility and Seller has no knowledge that any friable asbestos is present on the Real Property;

(xi) no portion of the Real Property is on a CERCLA, CERCLIS or RCRIS list or the National Priorities List of Hazardous Waste Sites or any similar list or database maintained by any governmental authority, nor is Seller listed as, nor has it been notified that it is, a "potentially responsible person" with respect to the disposal or release of any Hazardous Material or the use or ownership of the Real Property; and

(xii) Seller is aware of no facts indicating that Seller is not in compliance with all requirements of Environmental Laws. Except as described in Schedule 2.8 hereto, Seller is aware of no facts and Seller has received no notice or communication, formal or informal, indicating that the DEP is considering revoking, suspending, canceling, rescinding or terminating any Environmental Permits.

(b) Seller has not and will not release or waive the liability of any previous owner, lessee, or operator of the Real Property or any party who may be potentially responsible for the presence or removal of Hazardous Material on or about the Real Property. Seller has no indemnification obligation regarding Hazardous Material to any party.

(c) Schedule 2.8 sets forth a correct and complete list of all notices, reports of environmental audits or investigations which have been performed on behalf of Seller, or which are otherwise in Seller's possession with respect to any of the Real Property. Seller has delivered correct and complete copies of such notices and reports to Buyer.

2.9. Compliance with Law. Except as otherwise disclosed on Schedule 2.9, the Facility, the Facility Assets and the Business, and Seller with respect to the Facility, the Facility Assets and the Business, are, in all material respects, in compliance with all requirements of applicable Laws. Without limiting the foregoing, Seller has paid all monies and obtained all licenses, permits, certificates and authorizations needed or required for the operation of the Facility and the use of the Real Property. Seller has properly filed all reports and other documents required to be filed with any federal, state, local or foreign government or subdivision or agency thereof. Seller has not received any notice, not heretofore complied with, from any federal, state or municipal authority or any insurance or inspection body that any of its properties, facilities, equipment or business procedures or practices fails to comply with any applicable Law.

2.10. Employment Matters.

(a) There are no collective bargaining agreements, or written or oral agreements relating to the terms and conditions of employment or termination of employment,

covering any employees, consultants or agents of the Facility, except as listed and described in Schedule 2.10.

(b)     Seller is not engaged in any unfair labor practice or other unlawful employment practice, and there are no unfair labor practice charges or other employee related complaints, grievances or arbitrations, against Seller pending before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, the Department of Labor, any arbitration tribunal or any other federal, state, local or other governmental authority by or concerning Seller's employees. There is no strike, picketing, slowdown or work stoppage by or concerning such employees pending against or involving Seller. No representation question is pending or threatened respecting any of Seller's employees.

(c)     Schedule 2.10 sets forth a correct and complete list of all insurance plans pension plans, profit sharing plans and other plans and benefits which are provided to or maintained for the benefit of any past or current employees of Seller. All handbooks, policies and procedures relating to all aspects of employment, including but not limited to compensation, benefits, equal employment opportunity and safety are listed and described in Schedule 2.10 attached hereto, and true and correct copies of the same have been provided to Buyer.

(d)     The Facility and the Business, and Seller with respect to the Facility and the Business, have complied with in the past and are now in material compliance with all labor and employment laws, including without limitation federal, state, local and other applicable laws, rules, regulations, ordinances, orders and decrees concerning collective bargaining, unfair labor practices, payments of employment taxes, occupational safety and health, worker's compensation, the payment of wages and overtime, and equal employment opportunity. The Facility and the Business, and Seller with respect to the Facility and the Business, are not liable for any arrears or wages, benefits, taxes, damages or penalties for failing to comply with any law, rule, regulation, ordinance, order or decree relating in any way to labor or employment.

(e)     Seller has provided to Buyer the names of all present employees of Seller and the positions, total annual compensation and accrued vacation and sick time of each.

2.11.   Litigation.   There are no Proceedings pending against, or threatened against, the Facility, the Facility Assets or the Business, or against or Seller relating to or affecting the Facility, the Facility Assets or the Business nor, to the best of the knowledge of Seller, is there any basis for any such Proceeding. Seller has not been operating under or subject to, or in default with respect to, any judgment, order, writ, injunction or decree of any court or federal, state, municipal or other governmental department, commission, board, agency or instrumentality, foreign or domestic.

2.12.   Tangible Personal Property; Intangible Property.

(a) On or prior to October 25, 2010 Seller with deliver to Buyer a schedule which, to the best of Seller's knowledge, will contain a description of all items of Tangible Personal Property have an original cost in excess of $1,000.

(b) Schedule 1.1(e) contains a description of all material Intangible Property. No Intangible Property or the use thereof conflicts with, or infringes upon, any rights of any third party (and there is no basis for any such claim of conflict). The Business has the sole and exclusive right to use the Intangible Property.

2.13.   Brokers. Except as described in Schedule 2.13 hereto, there is no broker or finder or other person entitled to a commission or brokerage fee or payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement of, or action taken by, Seller.

2.14.   Financial Matters.

(a)   The books of account and other financial records of Seller, all of which have been made available to Buyer, are correct and complete in all material respects, represent actual, bona fide transactions and have been maintained in accordance with sound business and accounting practices.

(b)   Seller has previously delivered to Buyer correct and complete copies of its balance sheets and statements of income, retained earnings and cash flows as of and for its fiscal years ended December 31, 2007, 2008 and 2009, including the footnotes thereto, and (ii) its monthly internal operating statements (as described in Section 4.1 (b)) as of and for the eight (8) months ended August 31, 2010 (the "Current Financial Statements" and, together with the items described in clause (i) above, the "Financial Statements"). The Financial Statements fairly present the financial condition of Seller as at the end of the periods covered thereby and the results of its operations and changes in its financial position for the periods covered thereby, and were prepared substantially in accordance with GAAP applied on a consistent basis throughout the periods covered thereby subject, in the case of the Current Financial Statements, to year-end adjustments (which will not be material) and the lack of footnotes and other presentation items.

(c)   Seller has no material Liabilities or any kind, whether direct or indirect, fixed or contingent or otherwise, other than (i) executory obligations under Contracts which are not required to be set forth in the Current Financial Statements substantially in accordance with GAAP and (ii) Liabilities incurred in the ordinary course of business since the date of the Current Financial Statements.

2.15.   Contracts. Except for the Assumed Contracts listed on Schedule 1.1(d) and the Excluded Contracts listed on Schedule 1.2(h), Seller is not a party to any Contract. Subject to the Confirmation Order and upon payment of the Cure Amounts with respect to the Assumed Contracts set forth on Schedule 1.1(d): (a) each Assumed Contract will be in full force and effect, and will be valid, binding and enforceable in accordance with its terms; and (b) all payments required under the Assumed Contracts will have been paid.

2.16.   Absence of Material Change. Since the Petition Date:

(a)   There has not been and there is not threatened any material adverse change in the financial condition, business, prospects or affairs of the Business or any material physical damage or loss to any of the Facility Assets (whether or not such damage or loss is covered by insurance);

(b)     Seller has not taken any action with respect to the Facility, Facility Assets or the Business outside of the ordinary and usual course of business, except as related to the transactions contemplated hereby;

(c)     Seller has preserved the Business intact, kept available the services of its employees, and preserved its relationships with its customers, suppliers and others with whom it deals;

(d)     Seller has not sold, transferred or otherwise disposed of any of its properties or assets or any interest therein, or agreed to do any of the foregoing; and

(e)     Seller has not granted, and is not committed to grant, any material salary increases to any employees.

2.17.   Affiliates.  No Affiliate of Seller has an interest in any of the Facility Assets or any property used in the operation of the Business. Neither Seller nor any Affiliate of Seller, has any financial interest in any supplier, advertiser or customer of Seller or in any other business with which Seller does business or competes. None of Seller, its Affiliates or its or their officers, directors or equity holders is party to any Assumed Contract or provides any goods or services to the Business. For purposes of this Agreement, an "Affiliate" of an entity means any person (or any relative of any person) or entity that owns or controls, is owned or controlled by, or under common control with, such entity.

2.18.   Disclosure.  All copies of Permits, Assumed Contracts and Excluded Contracts requested in writing by Buyer and delivered to Buyer by Seller are correct and complete copies of such Permits, Assumed Contracts or Excluded Contracts, as applicable. No provision of this Agreement relating to Seller, the Facility, the Facility Assets, or the Business and no Schedule or Exhibit hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated in order to make the statement, in light of the circumstances in which it is made, not misleading.

ARTICLE 3.   REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date:

3.1.   Status.  The Buyer is a corporation which is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Buyer has the requisite power to enter into and complete the transactions contemplated by this Agreement.

3.2.   Authority.  All corporate actions necessary to be taken by or on the part of Buyer in connection with the transactions contemplated by this Agreement have been duly and validly taken, and this Agreement has been duly and validly authorized, executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with and subject to its terms.

3.3.   No Conflicts.  Neither the execution, delivery and performance by Buyer of this Agreement nor the consummation by Buyer of the transactions contemplated hereby will:  (a)

conflict with or violate the organizational documents of Buyer; or (b) violate any Laws applicable to Buyer.

3.4.   Brokers.  There is no broker or finder or other person entitled to a commission or brokerage fee or payment in connection with this Agreement or the transactions contemplated hereby as a result of any agreement of or action taken by Buyer.

3.5.   Approvals and Consents.  The execution, delivery and performance by the Buyer of this Agreement and the consummation by it of the transactions contemplated hereby will not require any consent, permit, license or approval of, or filing with or notice to, any person, entity or governmental or regulatory authority under any provision of law applicable to Buyer or any Contract to which Buyer is a party, except for those that will have been obtained on or prior to the Closing Date.

ARTICLE 4.  COVENANTS OF SELLER

Seller covenants and agrees that from the date hereof until the completion of the Closing:

4.1.   Operation of the Business.

(a)   Seller shall continue to carry on the Business and keep its books and accounts, records and files in the usual and ordinary manner in which the Business has been conducted in the past. Seller shall collect the Facility's accounts receivable only in the ordinary course of business consistent with past practice, and shall not discount, or otherwise reduce the amount owed in respect of, any Receivables. Seller shall operate the Facility in accordance with the terms of the Permits and all Environmental Laws. Seller shall maintain the Permits in full force and effect and shall timely file and prosecute any necessary applications for renewal of the Permits.

(b)   Seller shall provide Buyer with copies of the regular monthly internal operating statements relating to the Facility for the monthly accounting periods between the date of this Agreement and the Closing Date by the 15th day of each calendar month for the preceding calendar month, which shall present fairly the financial position of the Facility and the results of operations for the period indicated substantially in accordance with generally accepted accounting principles. Such monthly statements shall show: (i) the actual results for such month and the budget for such month by line item, and (ii) account for items of non-recurring income and expense separately and (iii) account for and separately state all intercompany allocations of expenses relating to the Facility, all of which shall be presented fairly and in accordance with GAAP.

(c)   Seller shall make commercially reasonable efforts to preserve the business organization of the Facility intact, retain substantially as at present the Facility's employees, consultants and agents, and preserve the goodwill of the Facility's suppliers, advertisers, customers and others having business relations with it.

(d)   Seller shall make commercially reasonable efforts to maintain all Tangible Personal Property and Real Property in substantially its condition on the date of this Agreement (ordinary wear and tear excepted) and repair and maintain adequate and usual supplies of

inventory, office supplies, spare parts and other materials as have been customarily maintained in the past. Seller shall make all reasonable efforts to preserve intact the Facility Assets and maintain in effect its current casualty and liability insurance on the Facility Assets.

(e) Prior to the Closing Date, Seller shall not, without the prior written consent of Buyer:

(i) sell, lease, transfer, or agree to sell, lease or transfer, any Facility Assets except for sales or leases, in the ordinary course of business of items which are being replaced by assets of comparable or superior kind, condition and value;

(ii) except as may be required by applicable law, grant any raises to employees of the Business, pay any substantial bonuses or enter into any contract of employment with any employee or employees of the Business, except in the ordinary course of business;

(iii) renew, renegotiate, modify, amend, reject or terminate any Permit included in the Facility Assets or any Assumed Contract;

(iv) enter into, renew or amend any other Contract with respect to the Business, except (i) in the ordinary course of business and (ii) the assumption of the lease with the Girl Scouts Western Pennsylvania referenced as item 2 on Schedule 2.7(a);

(v) make any change in any of the buildings, leasehold improvements or fixtures of the Facility, except in the ordinary course of business, including planned cell construction; or

(vi) enter into any barter or trade contracts that are prepaid, or any contract with an Affiliate of Seller.

4.2.    Access to Facilities, Files and Records.  At the request of Buyer, Seller shall from time to time give or cause to be given to the officers, employees, accountants, counsel, agents, consultants and representatives of Buyer: (a) reasonable access during normal business hours to all facilities, properties, accounts, books, deeds, title papers, insurance policies, licenses, agreements, contracts, commitments, records and files of every character, equipment, machinery, fixtures, furniture, vehicles, notes and accounts payable and receivable of Seller with respect to the Facility, the Facility Assets and the Business; and (b) all such other information concerning the affairs of the Facility, the Facility Assets and the Business as Buyer may reasonably request. Seller shall cause its accountants and any agent of Seller in possession of Seller's books and records to cooperate with Buyer's requests for information pursuant to this Agreement. Without limiting the generality of the foregoing, (i) Seller agrees that Buyer may perform a Phase I environmental audit on the Real Property, so long as such audit does not involve drilling or other invasive testing, (ii) Buyer may perform a Phase 2 environmental audit on the Real Property owned by Seller, and (iii) with respect to Real Property leased by Seller, upon the written request of the Buyer to perform a Phase 2 environmental audit on such leased Real Property, Seller shall use its best efforts to obtain the consent of the lessor thereof;.

4.3.    Consents.  Seller shall use its best efforts to obtain, or assist Buyer in obtaining, all of the consents noted on Schedule 2.5 hereto, including any consents required from the DEP

for transfer of the Environmental Permits issued by the DEP from Seller to Buyer (the "DEP Consent"); provided, however, Seller shall not be required to pay any sums or post any bonds required to be paid or posted by the DEP in connection with obtaining the DEP consent or transferring or modifying any Permits (other than the payment of any fines or penalties for past violations). If Seller does not obtain a consent required to assign or transfer a Contract or Permit hereunder, Buyer shall not be required to assume such Contract or Permit. Marked with an asterisk on Schedule 2.5 are those consents the receipt of which is a condition precedent to Buyer's obligation to close under this Agreement (the "Required Consents").

4.4.    Notice of Proceedings.   Seller will promptly notify Buyer in writing upon: (a) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated hereunder; or (b) receiving any notice from any governmental department, court, agency or commission or any other Person of its intention (i) to institute an investigation into, or institute a Proceeding to restrain or enjoin, the consummation of this Agreement or such transactions, or (ii) to nullify or render ineffective this Agreement or such transactions if consummated.

4.5.    Consummation of Agreement.   Subject to the provisions of Section 10.1 of this Agreement Seller shall use its commercially reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transactions contemplated by this Agreement to be fully carried out.

4.6.    Representations and Warranties.     Seller shall give written notice to Buyer promptly upon learning of the occurrence of any event that would cause or constitute a breach or would have caused a breach had such event occurred or been known to Seller prior to the date hereof, of any of the representations and warranties of Seller contained in this Agreement. In addition, in connection with the submission of this Agreement to Seller, representations and warranties hereunder have been added or modified in a manner that may require further disclosure by Seller, and Seller shall promptly make such additional disclosures. Unless otherwise specifically agreed to by the parties in writing, no such disclosure will be considered to be an amendment to this Agreement or the Schedules hereto.

4.7.    Employee Matters.

(a)     Nothing in this Agreement (i) requires Buyer to hire, or to offer to hire, any employees of Seller, (ii) constitutes an offer to employ such employees, or (iii) requires Buyer to pay any such persons severance pay in the event of termination of employment. Notwithstanding the foregoing, Buyer may make offers of employment to certain of Seller's employees working in the Business, and Seller will use its best efforts to persuade such employees to accept such offers. Prior to the Closing Date, Seller will afford Buyer reasonable access to Seller's employees to allow Buyer to interview such employees, and Seller agrees to make available to Buyer, to the fullest extent permitted by Law, all information and materials requested by Buyer from the personnel files of each employee to whom Buyer is considering offering employment; provided, however, Buyer agrees to coordinate interviews of employees and review of files with Seller so as to reduce disruption of Seller's Business.

(b)     Buyer does not and will not assume or be responsible for any Liabilities arising out of any employment relationship between Seller and any employee or former employee of Seller. Without limiting the generality of the foregoing, Buyer will have no Liability in connection with Seller's employees or former employees and their beneficiaries for (i) contributions to or payments under employee benefit plans, stock options, programs, arrangements or understandings, (ii) accrued, but unused, sick leave, vacation pay and severance pay, if any, (iii) Liabilities under any collective bargaining agreement or bargaining relationship, or (iv) claims, demands, administrative proceedings or suits arising out of or in connection with alleged unlawful employment practices of Seller, all of which are Excluded Liabilities.

4.8     Certain Schedules Subject to Completion. On or before October 25, 2010 Seller shall deliver Schedule 1.1(b) hereto to Buyer, and shall update Schedule 1.1(c)(i), Schedule 1.1(c)(ii) and Schedule 2.5 and deliver such updated Schedules to Buyer. The representations contained in this Agreement with respect to the four Schedules referred to in this Section 4.8 shall be deemed to be only with respect to the Schedules delivered pursuant to this Section 4.8.

## ARTICLE 5. COVENANTS OF BUYER

Buyer covenants and agrees that from the date hereof until the completion of the Closing:

5.1.     Representations and Warranties. Buyer shall give detailed written notice to Seller promptly upon learning of the occurrence of any event that would cause or constitute a breach or would have caused a breach had such event occurred or been known to Buyer prior to the date hereof, of any of the representations and warranties of Buyer contained in this Agreement. Unless otherwise specifically agreed to by the parties in writing, no such disclosure will be considered to be an amendment to this Agreement or the Schedules hereto.

5.2.     Consummation of Agreement. Subject to the provisions of Section 10.1 of this Agreement, Buyer shall use its commercially reasonable efforts to fulfill and perform all conditions and obligations on its part to be fulfilled and performed under this Agreement, and to cause the transactions contemplated by this Agreement to be fully carried out.

5.3.     Notice of Proceedings. Buyer will promptly notify Seller in writing upon: (a) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated hereunder; or (b) receiving any notice from any governmental department, court, agency or commission or any other Person, of its intention (i) to institute a Proceeding to restrain or enjoin, the consummation of this Agreement or such transactions, or (ii) to nullify or render ineffective this Agreement or such transactions if consummated.

5.4.     Consents. Buyer shall use its commercially reasonable efforts to obtain the DEP Consent, including payment of any application fee or (subject to Section 8.4) the posting of any bonds required to be paid or posted by the DEP in connection with the transfer of the Permits from Seller to Buyer.

5.5.     Financial Condition. Buyer shall promptly notify Seller of any change in Buyer's financial condition, business or operations which would negatively impact Buyer's ability to performs its obligations hereunder.

5.6.    Manderfeld. Buyer will agree to offer Michael Manderfeld employment for six (6) months commencing on the Closing Date in his current position at a salary of $70,000 per annum, plus benefits consistent with those offered to other employees of Buyer at the Facility. In addition, Mr. Manderfeld would receive a $15,000 bonus upon completion of three (3) months and six (6) months of employment.

## ARTICLE 6. AGREEMENTS OF SELLER AND BUYER.

6.1.    Certain Other Matters. Seller and Buyer hereby acknowledge and agree as follows: (a) Buyer has conducted an independent investigation of the Facility Assets and, except for the representations, warranties covenants and obligations of Seller expressly set forth in this Agreement, is purchasing the Facility Assets on an "as-is, where-is" basis, (b) except as expressly set forth in this Agreement, Seller makes no representations or warranties, express or implied, at law or in equity, in respect of the Facility Assets or otherwise in connection with this Agreement including with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed, (c) Buyer has not relied on any representations or warranties by or on behalf of Seller in connection with its execution of this Agreement or the consummation of the transactions contemplated by this Agreement except for those set forth in this Agreement, and any such other representations or warranties shall not be implied at law or in equity, (d) except as expressly set forth in this Agreement, Buyer makes no representations or warranties, express or implied, at law or in equity, in connection with this Agreement, and any such other representations or warranties are hereby expressly disclaimed, (e) Seller has not relied on any representation or warranties by or on behalf of Buyer in connection with its execution of this Agreement or the consummation of the transactions contemplated by this Agreement except for those set forth in this Agreement, and any such other repetitions or warranties shall not be implied at law or in equity and (f) the representations and warranties of neither Buyer nor Seller shall survive the Closing. The terms and provisions of this paragraph shall survive the Closing.

6.2.    Confidentiality.

(a)      As used in this Section the "Confidential Information" of a party means all information concerning or related to the business, operations, financial condition or prospects of such party or any of its Affiliates, regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form, and specifically includes (i) all information regarding the officers, directors, employees, equity holders, customers, suppliers, distributors, sales representatives and licensees of such party and its Affiliates, in each case, whether present or prospective, (ii) all inventions, discoveries, trade secrets, processes, techniques, methods, formulae, ideas and know-how of such party and its Affiliates, (iii) all financial statements, audit reports, budgets and business plans or forecasts of such party and its Affiliates, and (iv) this Agreement and the transactions contemplated hereby; provided, that the Confidential Information of a party does not include (A) information which is or becomes generally known to the public through no act or omission of the other party and (B) information which has been or hereafter is lawfully obtained by the other party from a source other than the party to whom such Confidential Information belongs (or any of its Affiliates or their respective officers, directors, employees, equity holders or agents) so long as, in the case of information obtained from a third party, such third party was or is not, directly or indirectly, subject to an

obligation of confidentiality owed to the party to whom such Confidential Information belongs or any of its Affiliates at the time such Confidential Information was or is disclosed to the other party.

(a)     Except as otherwise permitted by subsection (c) below, each party agrees that it will not, without the prior written consent of the other party, disclose or use for its own benefit any Confidential Information of the other party.

(b)     Notwithstanding subsection (b) above, each of the parties is permitted to:

(i)     disclose Confidential Information of the other party to its officers, directors, employees, equity holders, lenders, agents, and Affiliates, but only to the extent reasonably necessary in order for such party to perform its obligations and exercise its rights and remedies under this Agreement, and such party will take all such action as are necessary or desirable in order to ensure that each of such Persons maintains the confidentiality of any Confidential Information that is so disclosed;

(ii)     make additional disclosures of or use for its own benefit Confidential Information or the other party, but only if and to the extent that such disclosures or use are specifically contemplated by this Agreement; and

(iii)     disclose Confidential Information of the other party to the extent, but only to the extent, required by applicable Laws; provided, that prior to making any disclosure pursuant to this subsection, the disclosing party will notify the affected party of the same, and the affected party will have the right to participate with the disclosing party in determining the amount and type of Confidential Information of the affected party, if any, which must be disclosed in order to comply with applicable Laws.

(c)     Subject to the following two sentences, all information that constitutes Confidential Information of Seller and which relates to the Facility, the Facility Assets or the Business as of immediately prior to the Closing shall be deemed to be Confidential Information of Buyer as of the Closing and thereafter, and Seller shall have no further rights thereto except as specifically provided herein. Confidential Information of the Seller relating to Excluded Assets and Excluded Liabilities shall remain Confidential Information of the Seller as of the Closing and thereafter, and Buyer shall have no further rights thereto. Seller shall be permitted to utilize Confidential Information as of and after the Closing to the extent necessary reasonably necessary to wind up its affairs, including but not limited to filing tax returns and complying with any other reporting or filing obligations, liquidating its remaining assets, and filing pleadings or otherwise disclosing information in connection with its bankruptcy case.

(d)     The obligations of the parties under this Section shall survive the Closing.

ARTICLE 7.  CONDITIONS TO THE OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are, at its option, subject to the fulfillment of the following conditions prior to or on the Closing Date:

7.1.     Representations, Warranties and Covenants.

(a)     Each of the representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects as of the date when made and shall be deemed to be made again on and as of the Closing Date and shall then be true and correct, except to the extent changes are permitted or contemplated pursuant to this Agreement.

(b)     Buyer shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     Buyer shall have furnished Seller with a certificate, dated the Closing Date and duly executed by an officer authorized on behalf of Buyer to give such a certificate, to the effect that the conditions set forth in Sections 7.1(a) and (b) have been satisfied.

7.2.     Proceedings.  Neither Seller nor Buyer shall be subject to any pending Proceeding by or before any governmental entity or arbitrator seeking to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement or seeking monetary relief against Seller by reason of the consummation of such transactions, and there shall not be in effect any judgment or order which has such effect. In the event such a restraining order or injunction is in effect, this Agreement may not be abandoned by Seller pursuant to this Section 7.2 prior to the Closing Date, but the Closing shall be delayed during such period. This Agreement may be abandoned if such restraining order or injunction remains in effect for more than ninety (90) days after receipt of all Required Consents.

7.3.     DEP Consent.  The consent of the DEP to the transactions contemplated hereby shall have been granted.

7.4.     Deliveries.  Buyer shall have complied with each and every one of its obligations set forth in Section 9.2.

7.5.     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Confirmation Order which, inter alia, approves this Agreement and the transactions contemplated hereby and is otherwise reasonably acceptable to Seller in form and substance.

7.6.     Release of Funds.  Seller shall have received from Evergreen National Indemnity Company ("Evergreen"), as the return of its cash collateral less any amounts owed to Evergreen, the sum of at least $3.0 million (the "Released Funds"), or shall have received evidence or a commitment from Evergreen, satisfactory to Seller in its sole discretion, that it shall receive the Released Funds on or before the thirtieth (30th) day following the Closing Date.

7.7.  Release of Obligation to DEP. Seller shall have no further liability to the DEP in respect of the Environmental Permits issued by the DEP, other than the payment of any fines or penalties for past violations of such Environmental Permits.

## ARTICLE 8.  CONDITIONS TO THE OBLIGATIONS OF BUYER

The obligations of Buyer under this Agreement are, at its option, subject to the fulfillment of the following conditions prior to or on the Closing Date:

8.1.  Representations, Warranties and Covenants.

(a)  Each of the representations and warranties of Seller contained in this Agreement shall have been true and correct as of the date when made and shall be deemed to be made again on and as of the Closing Date and shall then be true and correct except to the extent changes are permitted or contemplated pursuant to this Agreement.

(b)  Seller shall have performed and complied in all material respects with each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)  Seller shall have furnished Buyer with a certificate, dated the Closing Date and duly executed by an officer authorized on behalf of Seller to give such a certificate, to the effect that the conditions set forth in Sections 8.1(a) and (b) have been satisfied.

8.2.  Proceedings.  Neither Seller nor Buyer shall be subject to any pending Proceeding by or before any governmental entity or arbitrator seeking to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement or seeking monetary relief against Seller by reason of the consummation of such transactions, and there shall not be in effect any judgment or order which has such effect. In the event such a restraining order or injunction is in effect, this Agreement may not be abandoned by Seller pursuant to this Section 8.2 prior to the Closing Date, but the Closing shall be delayed during such period. This Agreement may be abandoned if such restraining order or injunction remains in effect for more than ninety (90) days after receipt of all Required Consents.

8.3.  Deliveries.  Seller shall have complied with each and every one of its obligations set forth in Section 9.1.

8.4.  Required Consents.  Seller shall have obtained all of the Required Consents, or, in the case of Assumed Contracts and Permits which are not transferable or for which a consent to assignment cannot be obtained, Buyer shall have obtained or entered into similar permits and contracts in its own name. In addition, (a) the bonding requirement under Solid Waste Management Permit No. 100361 (the "Landfill Permit") shall have been modified such that Buyer may operate the Facility by posting a bond not in excess of $6,500,000 and (b) Buyer shall have no liability for any violation of the Permits by Seller.  Notwithstanding the foregoing, it shall not be a condition to Closing that the DEP (x) approve the transfer of the Landfill Permit insofar as it relates to the disposal of 5,000 tons of solid waste per day by rail or (y) approve the Rail Permit; provided, that if the DEP does not provide such approvals, Seller will have no further right to such Permits, including any right to renew or transfer the same.

8.5.    <u>Adequate Assurance</u>. Buyer shall not be required to provide adequate assurance of future performance of an Assumed Contract other than (a) payment of a Cure Amount thereunder not in excess of the higher of (1) such amount set forth on <u>Schedule 1.1(d)</u> or (2) such greater amount ordered by the Bankruptcy Court, (b) a written assumption and (c) such other evidence of Buyer's ability to perform such Assumed Contract as may reasonably by required by the Bankruptcy Court (which shall not include the payment of any additional money or the posting of any security); provided, however, in no event shall the Cure Amount required to be paid pursuant to clause (a) above exceed $100,000.

8.6.    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered a Confirmation Order which, inter alia, approves this Agreement and the transactions contemplated hereby and is otherwise reasonably acceptable to Buyer in form and substance, and such order shall be final and non-appealable.

8.7.    <u>Contracts</u>. Each party to an Assumed Contract will have complied with all material covenants and provisions applicable to it and will not be in default in any material respect thereunder; no party will have asserted any defense, setoff or counterclaim under any Assumed Contract, or granted any waiver, indulgence or postponement of obligations thereunder; and no notice of any default or termination under any Assumed Contract will have been given or received, and no condition or event that, with the giving of notice, the lapse of time, or the happening of any further event would become a default under any Assumed Contract or permit early termination thereunder shall exist.

8.8.    <u>Available Airspace</u>. The Facility shall have airspace available for the disposal of municipal solid waste in cells that have been constructed and permitted (which includes any required DEP approval or inspection) and which are accessible and immediately available for use in accordance with the following: (a) if the Closing occurs on March 31, 2011, 30,000 tons of airspace; and (b) if the Closing occurs prior to March 31, 2011, 30,000 tons of airspace <u>plus</u>, for each week between the Closing Date and March 31, 2011, an additional 1,250 tons of airspace (but in no event will more than 50,000 tons of airspace be required).

ARTICLE 9. <u>ITEMS TO BE DELIVERED AT THE CLOSING</u>

9.1.    <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver to Buyer duly executed by Seller or such other signatory as may be required by the nature of the document:

(a)    bills of sale, certificates of title, endorsements, assignments, special warranty deed and other good and sufficient instruments of sale, conveyance, transfer and assignment, in form and substance satisfactory to Buyer, sufficient to sell, convey, transfer and assign Facility Assets to Buyer free and clear of any Liens (other than Permitted Encumbrances) and to quiet Buyer's title thereto;

(b)    certified copies of appropriate resolutions, duly adopted, which shall be in full force and effect at the time of the Closing, authorizing the execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby; and

(c)    the certificate referred to in Section 8.1(c).

9.2.    <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver to Seller:

(a)    the Purchase Price, which shall be paid in the manner specified in Section 1.4;

(b)    an instrument or instruments of assumption of the Contracts and Real Property leases to be assumed by Buyer pursuant to this Agreement;

(c)    certified copies of resolutions, duly adopted by the Boards of Directors of Buyer, which shall be in full force and effect at the time of the Closing, authorizing the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby; and

(d)    copies of all Permits, together with evidence that such Permits have been properly transferred to Buyer, and all closure/post closure financial assurances.

# ARTICLE 10. <u>MISCELLANEOUS</u>

10.1.    <u>Termination</u>.

(a) This Agreement may be terminated at any time prior to Closing: (i) by the mutual consent of Seller and Buyer; (ii) by either party hereto if the DEP or the Bankruptcy Court has denied the approvals contemplated by this Agreement; (iii) by Buyer as provided in Section 10.6 (Risk of Loss); (iv) by Buyer or Seller if the Closing has not taken place on or before March 31, 2011; (v) by Buyer or Seller if the Confirmation Order has not been entered by November 30, 2010; (vi) by Buyer if Seller has failed to cure a breach of any of its representations, warranties or covenants under this Agreement within fifteen (15) calendar days after it receives notice from Buyer of such breach; (vii) by Seller if Buyer has failed to cure a breach of any of its representations, warranties or covenants under this Agreement within fifteen (15) calendar days after it receives notice from Seller of such breach; or (viii) by Buyer if the Seller's bankruptcy filing is dismissed or converted to a filing under Chapter 7 of the Bankruptcy Code. Notwithstanding the foregoing, neither party may terminate this Agreement pursuant to clause (ii), (iv) or (v) if the event which would otherwise permit such party to terminate was caused by the failure of such party to perform its obligations under this Agreement. A termination pursuant to this Section 10.1 shall not relieve any party of any liability it would otherwise have for a breach of this Agreement.

(b) Except as provided in the following sentence, if this Agreement is terminated, Seller shall promptly return the Deposit, together with interest thereon, to Buyer in full and complete satisfaction of any and all damages incurred by Buyer on account of such default by Seller. If this Agreement is terminated by reason of clause (vii), Seller shall be entitled to retain the Deposit, together with interest thereon, as liquidated damages in full and complete satisfaction of any and all damages incurred by Seller on account of such default by Buyer. Buyer and Seller acknowledge and agree that in the event of any failure to close as provided in the preceding paragraph it would be difficult or impossible to ascertain the precise amount of Seller's damages, and the amount of the Deposit to be retained by Seller is a fair and reasonable estimate of the amount of such damages. Nothing in this Section is intended to prevent Buyer from seeking

enforcement of this Agreement or the Plan in the Bankruptcy Court upon a default by Seller hereunder.

10.2. <u>Expenses</u>. Each party hereto shall bear all of its expenses incurred in connection with the transactions contemplated by this Agreement, including without limitation, accounting and legal fees incurred in connection herewith. The parties recognize and acknowledge that they may be exempt under Section 1146(c) of the Bankruptcy Code and the Confirmation Order from state and local transfer, recording, stamp or other similar transfer taxes (collectively, the "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Facility Assets; provided, however, that if Transaction Taxes are assessed for any reason, Buyer shall be solely responsible for the payment of such Transaction Taxes, along with any recording and filing fees. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated by this Agreement.

10.3. <u>Remedies Cumulative</u>. The remedies provided in this Agreement shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against the other party hereto.

10.4. <u>Further Assurances</u>. From time to time prior to, on and after the Closing Date, each party hereto will execute all such instruments and take all such actions as any other party shall reasonably request, without payment of further consideration, in connection with carrying out and effectuating the intent and purpose hereof and all transactions contemplated by this Agreement, including without limitation the execution and delivery of any and all confirmatory and other instruments in addition to those to be delivered on the Closing Date, and any and all actions which may reasonably be necessary to complete the transactions contemplated hereby. The parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement.

10.5. <u>Public Announcements</u>. Prior to the Closing Date, no party shall, without the approval of the other party hereto, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except (i) to announce it has been entered into, and (ii) as and to the extent that such party shall be so obligated by law, in which case such party shall give advance notice to the other party and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued. Notwithstanding the foregoing, nothing in this Agreement shall (i) preclude any required filing of this Agreement with the Bankruptcy Court, or (ii) prevent Seller from notifying employees, prior to the Closing Date, of the sale of the Facility Assets to the Buyer contemplated by this Agreement and providing information as to the status of the transactions contemplated hereby between the date hereof and the Closing Date.

10.6. <u>Risk of Loss</u>. The risk of loss, damage or destruction to any of the Facility Assets shall be borne by Seller at all times up to 12:01 a.m. local time on the Closing Date, and it shall be the responsibility of Seller to repair or cause to be repaired and to restore the property to its condition prior to any such loss, damage, or destruction. In the event of any such loss, damage, or destruction, the proceeds of any claim for any loss, payable under any insurance policy with respect thereto, shall be used to repair, replace, or restore any such property to its former

condition, subject to the conditions stated below. In the event of any loss or damage to any of the Facility Assets, Seller shall notify Buyer thereof in writing immediately. Such notice shall specify with particularity the loss or damage incurred, the cause thereof (if known or reasonably ascertainable), and the insurance coverage. In the event that the property is not completely repaired, replaced or restored on or before the scheduled Closing Date, Buyer at its option: (a) may elect to postpone Closing until such time as the property has been completely repaired, replaced or restored; or (b) may elect to consummate the Closing and accept the property in its then condition, in which event Seller shall pay to Buyer all proceeds of insurance and assign to Buyer the right to any unpaid proceeds; or (c) terminate this Agreement.

ARTICLE 11. <u>DEFINITIONS</u>

As used in this Agreement, the following capitalized terms shall have the meanings given to them below:

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Contract" means any agreement, contract, arrangement, understanding, lease, note, bond, mortgage, indenture, loan agreement, franchise agreement, covenant, employment agreement, license instrument, purchase and sales order, commitment, undertaking, obligation, or other legally binding agreement, whether written or oral, and including all amendments thereto.

"Encumbrances" means liens, security interests, encumbrances, adverse claims, leases, rights of repurchase or purchase, rights of first refusal, pledges, voting trusts, equities and other restrictions, limitations or conditions on transfer of any nature whatsoever.

"Environmental Laws" means all Laws relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including laws and regulations relating to workplace or worker safety and health or emissions, discharges, releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, Release or handling of Hazardous Materials.

"Environmental Permits" means any Permits required under Environmental Laws.

"Hazardous Materials" means any chemicals, pollutants, contaminants, wastes and toxic substances, including: (A) the presence of which requires reporting, investigation, removal or remediation under any Environmental Law; (B) that is defined as a "hazardous waste," "hazardous substance," "hazardous material," "pollutant" or "toxic substance" under an Environmental Law; (C) that is toxic, explosive, corrosive, flammable, ignitable, infectious, radioactive, reactive, carcinogenic, mutagenic, or otherwise hazardous and is regulated as such under any Environmental Law; or (D) that contains gasoline or any other petroleum product or byproduct, polychlorinated biphenyls, asbestos and urea formaldehyde.

"Laws" means all federal, state, local and foreign statutes, laws, rules, regulations, orders, ordinances (including zoning restrictions and land use requirements and Environmental Laws

and regulations) and all administrative and judicial judgments, rulings, decisions and orders applicable to Seller, Buyer or the Facility Assets.

"Liabilities" means any claims, obligations, damages, actions, suits, Proceedings, demands, assessments, adjustments, penalties, losses, debts, costs and expenses and any other liabilities of any kind or nature whatsoever (including court costs, reasonable attorneys' and expert witness fees and expenses, consulting fees and expenses of investigation), whether equitable or legal, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent, asserted or unasserted, liquidated or unliquidated, accrued or unaccrued or due or to become due, and expressly including punitive damages, consequential damages, treble damages and any damages as a result of or relating to a loss of profits.

"Permits" means any permits, grants, filings, notices of intent, exemptions, licenses, authorizations, registrations, franchises, consents, approvals and related applications of every kind from or with any federal, state, local or foreign government or regulatory authorities or industrial bodies, in connection with the ownership, use or operation of the Facility, the Facility Assets or the Business.

"Proceedings" means any claim, investigation, litigation, action, suit or proceeding, formal arbitration, informal arbitration or mediation, administrative, judicial or otherwise.

"Release" means release, spill, leak, discharge, dispose of, pump, pour, emit, empty, inject, leach, migrate, dump or allow to escape into or through the environment.

"Seller Material Adverse Effect" means any effect, event, liability, circumstance, occurrence or change that, individually or in the aggregate, has or is reasonably likely to have a material adverse effect on the business, results of operations, financial condition or prospects of the Business, taken as a whole, other than effects, events or changes arising out of or resulting from (a) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (b) changes in general legal, regulatory, political, economic or business conditions or changes in generally accepted accounting principles that, in each case, generally affect industries in which the Seller conducts business, (c) the negotiation, execution, announcement or performance of this Agreement or the consummation of the transactions contemplated hereby, including the impact thereof on relationships, contractual or otherwise, with customers, suppliers, lenders, partners or employees, (d) acts of war, sabotage or terrorism, or any escalation or worsening of any such acts of war, sabotage or terrorism threatened or underway as of the date of this Agreement or (e) earthquakes, hurricanes or other natural disasters, but only to the extent any such effect, event or change described in clauses (a) through (e) do not materially disproportionately impact Seller, the Business or the Facility Assets.

ARTICLE 12. GENERAL PROVISIONS

12.1. Assignability; No Third Party Rights. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns. Notwithstanding the foregoing, no party may assign its rights or obligations under this Agreement without prior written consent of the other party, which consent shall not be unreasonably withheld, delayed, or

conditioned; provided, however, that Buyer may assign and delegate its rights and obligations under this Agreement to an Affiliate upon notice to, but not the prior written consent of, Seller. The covenants, conditions and provisions hereof are and shall be for the exclusive benefit of the parties hereto and their permitted assigns, and nothing herein, express or implied, is intended or shall be construed to confer upon or to give any person or entity other than the parties hereto and their permitted assigns any right, remedy or claim, legal or equitable, under or by reason of this Agreement.

12.2.  <u>Amendments; Waivers.</u>  The terms, covenants, representations, warranties and conditions of this Agreement may be changed, amended, modified, waived, or terminated only by a written instrument executed by the party waiving compliance. The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right of such party at a later date to enforce the same. No waiver by any party of any condition or the breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.3.  <u>No Personal Liability.</u>  No recourse shall be had for the payment of any claim arising under this Agreement against any past, present or future officer, director, member, employee or agent of the Seller, under any rule of law or equity, statute or constitution, or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, directors, members, employees or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Agreement and the consummation of the transactions contemplated hereunder.

12.4.  <u>Notices.</u>  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (which shall include notice by telex or facsimile transmission) and shall be deemed to have been duly made and received when personally served, or when delivered by Federal Express or a similar overnight courier service, expenses prepaid, or, if sent by telex, graphic scanning or other facsimile communications equipment, delivered by such equipment, addressed as set forth below:

(a)  if to Seller, then to:

Rustick, LLC
19 Ness Lane
Kane, PA  16735
Attention:  Randy Hendricks
Facsimile No.: 215-723-7753

with copies to:

Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Attention: Peter Hughes, Esq.
Facsimile No.: 215-575-7200

(b)  if to Buyer, then to:

Casella Waste Systems, Inc.
798 Cascadilla Street

Ithaca, NY 14850
Attention: Larry Shilling, Regional VP
Facsimile No.: 607-277-0599

with copies to:

Casella Waste Systems, Inc.
25 Green Hills Lane
Rutland, VT 05701
Attention: David L. Schmitt, VP and General
Counsel
Facsimile No.: 802-779-5030

and to:

Cohen & Grigsby, P.C.
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222
Attention: Clifford Levine
Facsimile No.: 412-209-0672

Any party may alter the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section providing for the giving of notice.

12.5.   Captions.   The captions of Articles and Sections of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

12.6.   Governing Law.   This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to principles of conflicts of laws.

12.7.   Entire Agreement.   This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all prior agreements, understandings, inducements or conditions, express or implied, oral or written, relating to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of trade inconsistent with any of the terms hereof.  This Agreement has been prepared by all of the parties hereto, and no inference of ambiguity against the drafter of a document therefore applies against any party hereto.

12.8.   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

[SIGNATURE PAGE FOLLOWS]

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

BUYER:                          BY:    _____
                                       Name:  John W. Casella
                                       Title:  Chairman and CEO


SELLER:                         RUSTICK, LLC

                                BY:    _____
                                       Name:
                                       Title:

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

BUYER:

By: _____
    Name: John W. Casella
    Title: Chairman and CEO

By: _____
    Name:
    Title: President

SELLER:

RUSTICK LLC
By: _____
    Name:
    Title:

RICHARD L. GODSHALL
PRESIDENT

## SCHEDULES

1.1(a)-Facility Assets - Real Property
1.1(b)-Tangible Personal Property
1.1(c)(i)-Environmental Permits
1.1(c)(ii)-Permits
1.1(d)-Assumed Contracts
1.1(e)-Intangible Personal Property
1.2(h)-Excluded Contracts
1.2(j)-Excluded Assets – Western Expansion
2.5-Required Approvals
2.6-Liens
2.7(a)-Real Property
2.8- Environmental Compliance; Environmental Permits
2.9-Compliance with Laws
2.10-Employment Matters
2.13-Broker

## Schedule 1.1(a)
## Facility Assets-Real Property

1. Fee simple interest in real estate located in the Township of Sergeant, County of McKean, Commonwealth of Pennsylvania, as described in the following deeds:

   Deed between the McKean County Solid Waste Authority, as grantor, and Rustick, LLC, as grantee, filed with the McKean County Recorder of Deeds on August 30, 2005 at Book 503, Page 169.

   Quitclaim Deed between the McKean County Solid Waste Authority, as grantor, and Rustick, LLC, as grantee, filed with the McKean County Recorder of Deeds on August 30, 2005 at Book 503, Page 175.

   Quitclaim Deed between the McKean County Solid Waste Authority, as grantor, and Rustick, LLC, as grantee, filed with the McKean County Recorder of Deeds on August 30, 2005 at Book 503, Page 180.

2. Lease Agreement dated August 30, 2005 with Girls Scouts Western Pennsylvania.

**Schedule 1.1(b)**
**Tangible Personal Property**

**To be supplied in accordance with Section 4.8 of the Asset Purchase Agreement**

**Schedule 1.1(c)(i)**
**Environmental Permits**

1. Solid Waste Management Permit No. 100361-issued 06/19/09; revised 04/21/10; expires 06/19/19
2. Solid Waste Management Permit No. 101694-issued 06/19/09; expires 06/19/19
3. Air Quality Title V Operating Permit No. 42-00174-issued 10/10/07; revised 12/18/09; expires 09/30/12
4. Chapter 105 Encroachment/Watershed Management General Permit No. GP 044291601 (Outfall Structures)-revised 08/30/05
5. Chapter 105 Encroachment/Watershed Management Permit No. E42-196-issued 07/09/90; revised 08/30/05
6. Chapter 105 Encroachment/Watershed Management Permit No. E42-344-issued 06/19/09
7. NPDES Permit No. PA0102288-last renewed 06/19/09; effective 07/01/09; expires 06/30/14
8. UST Registration #42-13243-11/17/05
9. Highway Occupancy Permit
10. PA DEP Act 90 Transportation Permits
11. Submerged Lands License Agreement

**Schedule 1.1(c)(ii)**
**Permits**

**To Be Supplied in accordance with Section 4.8 of the Asset Purchase Agreement**

## Schedule 1.1(d)
## Assumed Contracts

| Name and Mailing Address of Party | Contract Description | Contract Date | Cure Amount as of October 21, 2010 | Description of Ongoing Obligation |
|---|---|---|---|---|
| Caterpillar Financial Services Corp. 2120 West End Avenue Nashville, TN 37203 | Lease of a Caterpillar 826H Landfill Compactor S/N AWF00307 (UCC filed @ 2006031000607) | 3/21/2006 | $24,454.96 | $8,830.66 per month |
| GE Capital P.O. Box 64211 Pittsburgh, PA 15264-2111 | Lease of a Copier | 1/1/2010 | $0.00 | $67.80 per month rental payment |
| Girl Scouts of Western PA 30 Isabella Street, Suite 107 Pittsburgh, PA 15212 | Lease Agreement | 8/30/2005 | $15,000.00 | $2,500.00 per month as adjusted for 3% annual |
| GM Equipment Corp. 1229 Million Dollar Highway Kersey, PA 15846 | Lease of a 2000 Ford 750 Water Truck | 11/20/2006 | $0.00 | $1,590.00 per month rental |
| Great American Leasing Corp. P.O. Box 609 Cedar Rapids, IA 52406 | Lease of a Commercial Hot & Cold High Pressure Washer, Serial No. 197637 | 6/8/2006 | $176.23 | $148.67 per month rental payment |
| Great American Leasing Corp. P.O. Box 609 Cedar Rapids, IA 52406 | Lease of a 2007 Terex TC-35 Mini Excavator, Serial No. TC00350162 | 4/15/2008 | $1,004.12 | $907.88 per month rental payment |

| | | | | |
|---|---|---|---|---|
| Hasler, Inc. P.O. Box 3808 Milford, CT 06460-7808 | Lease of a Postage Meter | 2009 | $44.47 | $44.47 per month rental payment |

| | | | | |
|---|---|---|---|---|
| Sergeant Township 14200 Wilcox Road Mount Jewett, PA 16740 | Host Agreement | 8/2/2006 | $0.00 | $1.00 host fee per Ton that "crosses the scale" due on a quarterly basis |
| Smethport Area School District Attention: Sue Jordan 414 S. Mechanics Street Smethport, PA 16749 | Stipulation to Settle; Payments in Lieu of Real Estate Tax (Sergeant Township & McKean County are also bound by this Stipulation.) | 1/1/2006 | $7,260.63 | $.25 Per Ton that "crosses the scale" due on a quarterly basis |
| Sergeant Township 14200 Wilcox Road Mount Jewett, PA 16740 | Stipulation to Settle; Payments in Lieu of Real Estate Tax (Smethport Area School District and McKean County are also bound by this Stipulation.) | 1/1/2006 | $0.00 | N/A |
| McKean County c/of Daniel J. Hartle, Esquire McKean County Solicitor 3rd Floor, 78 Main Street Bradford, PA 16701 | Stipulation to Settlement; Payments in Lieu of Real Estate Tax (Smethport Area School District and Sergeant | 1/1/2006 | $0.00 | N/A |

| | | | | |
|---|---|---|---|---|
| | Township are also bound by this Stipulation.) | | | |
| Rochem Membrane Systems 300 Manhattan Beach Blvd. Manhattan Beach, CA 90266 | Service Agreement for Leachate Treatment Plan (Operational inspection by third party pursuant to PA Dept. of Environmental Protection Permit Requirement.) | 10/1/2009 | $3,200.00 | $3,200.00 cost per visit |
| Veolia ES Solid Waste of PA P.O. Box 6484 Carol Stream, IL 60197 | Agreement for Medical Waste Disposal | 12/1/2007 | $8.88 | N/A |
| Wild Blue Communications, Inc. Attention: EBP P.O. Box 4427 Englewood, CO 80155 | Internet Service Contract | 2007 | $0.00 | $79.95 due per month |
| TOTAL CURE AMOUNT | | | $51,149.29 | |

**Schedule 1.1(e)**
**Intangible Personal Property**

The following trade names:
Rustick
Rustick, LLC

# Schedule 1.2(h)

## Excluded Contracts

| Names and Mailing Address of Party | Contract Description | Contract Date |
|---|---|---|
| Evergreen National Indemnity Co.<br>6140 Parkland Blvd., #300<br>Cleveland, OH 44124 | Bonding, Indemnity, & Security Agreement | 6/1/2005 |
| Ernharth & Associates, Inc.<br>Wexford Professional Building<br>11676 Perry Highway, #2301<br>Wexford, PA 15090 | Agreement to service 401(k) | 11/1/2007 |
| Girl Scouts of Western PA<br>30 Isabella Street, Suite 107<br>Pittsburgh, PA 15212 | Real Estate Purchase Option Agreement Reaffirmation & Extensions of Option, as Amended and all related Agreements | 2/11/05, 10/2/2005 Amended 12/31/2009 |
| Girl Scouts of Western PA<br>30 Isabella Street, Suite 107<br>Pittsburgh, PA 15212 | Assignment and Assumption Agreement (including the Contractual Consent of Landowner dated April 30, 1992, the Hold Harmless Agreement dated April 30, 1992 and the Agreement dated April 6, 1994) (the McKean County Solid Waste Authority is also a party to this Agreement) | 06/2005 |
| J&J Honeydipping<br>1063 Lafferty Lane<br>Bradford, PA 16701 | Concentrate Hauling Agreement; Back-up service to haul leachate concentrate to Jamestown | 5/1/2009 |
| James E. Hennigan<br>P.O. Box 309<br>2 Kessler Avenue<br>Mount Jewett, PA 16740 | Concentrate Hauling Agreement to haul concentrate to Jamestown | 5/9/2009 |
| McKean County Solid Waste Authority<br>19 Ness Lane<br>Kane, PA 16735 | Assignment and Assumption Agreement (including the Contractual Consent of Landowner dates April 30, 1992, the Hold Harmless Agreement dated April 30, 1992 and the Agreement dated April 6, 1994) (the Girl Scouts are also a party to this Agreement) | 06/2005 |

| | | |
|---|---|---|
| McKean County Solid Waste Authority<br>19 Ness Lane<br>Kane, PA 16735 | Asset Purchase Agreement (and all related amendments) and Agreement to Assign & Assume Collateral Rights (McKean County is also a party to the Agreement to Assign) | 12/22/2004 |
| McKean County<br>c/of Daniel J. Hartle, Esquire<br>McKean County Solicitor<br>3rd Floor, 78 Main Street<br>Bradford, PA 16701 | Agreement to Assign & Assume Collateral Rights (McKean County Solid Waste Authority is also a party to this Agreement.) | 12/22/2004 |
| Michael Manderfeld<br>75 Owens Road<br>Warren, PA 16365 | Employment Agreement | 6/1/2008 |
| P.J. Murphy Forest Products Corp.<br>P.O. Box 300<br>Montville, NJ 07045 | Real Estate Lease Agreement w/Right of First Refusal | 2/1/2008 |
| Paychex<br>33 Dodge Road<br>Suite 101<br>Getzville, NY 14068 | Agreement for the Provision of Payroll Service | 2/1/2007 |
| RAM Forest Products, Inc.<br>HCR 1, Box 15-A<br>Attention: Paul J. Westerbug<br>Shinglehouse, PA 16748 | Land Purchase Option Agreement | 10/1/2006 |

## Insurance Agreements

| Names and Mailing Address of Party | Contract Description | Contract Date |
|---|---|---|
| AFLAC<br>Remittance Processing Service<br>1932 Wynnton Road<br>Columbus, GA 31999 | Long-Term Disability Insurance | 2006 |
| Chartis<br>22427 Network Place<br>Chicago, IL 60673-1224 | Worker's Compensation Insurance | 8/30/2009 |
| Fireman's Fund Insurance Co.<br>Dept. CH 10284<br>Palatine, IL 60055 | Liability Insurance | |
| Harleysville Life Insurance Co.<br>1400 Pennbrook Parkway<br>Lansdale, PA 16944 | Life Insurance | 2/1/2006 |
| Highmark Blue Shield<br>P.O. Box 382146<br>Pittsburgh, PA 15250 | Health & Vision Insurance | |
| MetLife<br>P.O. Box 804466<br>Kansas City, MO 64180-4446 | Dental Insurance | 2009 |
| Premium Financing Specialists<br>P.O. Box 13454<br>Newark, NJ 07188 | Pollution and Auto Insurance | 8/31/2009 |
| Selective Insurance<br>Box 371468<br>Pittsburgh, PA 15250 | Liability Insurance | 8/30/2009 |
| Sundahl & Company Insurance<br>58 Derrick Road<br>P.O. Box 368<br>Bradford, PA 16701 | Insurance Agent | 2005 |

**Schedule 1.2(j)**
**Excluded Assets-Western Expansion**

1. Real Estate Option Purchase Agreement dated February 11, 2005 and the Reaffirmation and Extension of Option Purchase Agreement dated October 2, 2006 as amended  by that Deferral Agreement and Amendments to Reaffirmation and Extension of Option Purchase Agreement dated December 31, 2009 with Girl Scouts Western Pennsylvania.
2. Land  Purchase Option Agreement dated October 1, 2006 with Ram Forest Products, Inc.
3. Real Estate Lease Agreement dated February 2008 with P.J. Murphy Forest Products Corp.

**To be completed by Seller in accordance with Section 4.8 of the Asset Purchase Agreement**

The DEP Consent with respect to the transfer of all Environmental Permits.*

*Pursuant to Section 4.3 and except as otherwise required under Section 8.4, the DEP Consent, including the modification to the Landfill Permit to reduce the bonding requirement to an amount not in excess of $6,500,000 is a Required Consent.

## Schedule 2.6
## Liens and Exceptions to Title

| Equipment | Company | Amount |
|---|---|---|
| Copier | GE Capital | $67.80/Month |
| Postage Meter | Hasler, Inc. | $44.47/Month |
| Pressure Washer | Great American Leasing* | $148.67/Month |
| Mini Excavator | Great American Leasing* | $907.88/Month |
| Water Truck | GM Equipment | $1,590.00/Month |

Liens by (i) J.P. Morgan Trust Company (UCC filing no. 2005090202135)--fixture filing; (ii) The Bank of New York Mellon Trust Company (UCC filing no. 20050902022452--revenue pledge and "Borrower Account" (as defined in the Trust Indenture dated as of 8/15/05; (iii) Caterpillar Financial Services Corporation (UCC filing no. 2006030705054)—Caterpillar D400E S/N: 8PS00879[rock truck], Caterpillar 330CL S/N: DKY01171[excavator], Caterpillar 924G S/N: 9SW02172; (iv) Caterpillar Financial Services Corporation (UCC filing no. 2006031000607)-- Caterpillar 826H S/N: AWF00307; and (v) *GreatAmerica Leasing Corporation filed a UCC-1 at file no. 2008041707384 – relating to 2007 Terex TC-35 mini excavator

Real estate taxes are past due, but Seller is not aware of liens having been filed.

**Schedule 2.7(a)**
**Real Property**

1.  Seller has a fee simple interest in that certain real property and mineral rights conveyed to Seller pursuant to the following deeds:

    Deed between the McKean County Solid Waste Authority, as grantor, and Rustick, LLC, as grantee, filed with the McKean County Recorder of Deeds on August 30, 2005 at Book 503, Page 169.

    Quitclaim Deed between the McKean County Solid Waste Authority, as grantor, and Rustick, LLC, as grantee, filed with the McKean County Recorder of Deeds on August 30, 2005 at Book 503, Page 175.

    Quitclaim Deed between the McKean County Solid Waste Authority, as grantor, and Rustick, LLC, as grantee, filed with the McKean County Recorder of Deeds on August 30, 2005 at Book 503, Page 180.

2.  Seller leases approximately 27 acres of real property located in Sergeant Township, McKean County from Girl Scouts Western Pennsylvania pursuant to a Lease Agreement dated August 30, 2005.

3.  Seller leases certain real property located in Sergeant Township, McKean County from P.J. Murphy Forest Products Corp. pursuant to a Real Estate Lease dated February 2008.

# Schedule 2.8
# Environmental Compliance

**Seller maintains the following Environmental Permits:**

1. Solid Waste Management Permit No. 100361-issued 06/19/09; revised 04/21/10; expires 06/19/19
2. Solid Waste Management Permit No. 101694-issued 06/19/09; expires 06/19/19
3. Air Quality Title V Operating Permit No. 42-00174-issued 10/10/07; revised 12/18/09; expires 09/30/12
4. Chapter 105 Encroachment/Watershed Management General Permit No. GP 044291601 (Outfall Structures)-revised 08/30/05
5. Chapter 105 Encroachment/Watershed Management Permit No. E42-196-issued 07/09/90; revised 08/30/05
6. Chapter 105 Encroachment/Watershed Management Permit No. E42-344-issued 06/19/09
7. NPDES Permit No. PA0102288-last renewed 06/19/09; effective 07/01/09; expires 06/30/14
8. UST Registration #42-13243-11/17/05
9. Highway Occupancy Permit
10. Submerged Lands License Agreement
11. PA DEP Act 90 Transportation Permits

**Seller received the following Notices:**

1. Seller received a Notice of Violation from Pennsylvania Department of Environmental Protection, Warren District Office, dated June 11, 2010. The text of the Notice of Violation is attached.

2. Seller received a Notice of Violation from Pennsylvania Department of Environmental Protection dated July 22, 2010 regarding Chapter 105 Permit No. E42-344.

3. Seller received a Notice of Violation from Pennsylvania Department of Environmental Protection dated January 26m 2009 regarding exceedance of pH limit in NPDES permit-penalty pending as of 04/09.

**Pennsylvania**
Department of Environmental Protection
Warren District Office

June 11, 2010

<u>NOTICE OF VIOLATION</u>

Mr. Richard Godshall
President
Rustick LLC
19 Ness Lane
Kane, PA 16735

Re:    Bonding Requirements
        McKean County Landfill
        Waste Management Permit No. 100361
        Sergeant Twp., McKean County

Dear Mr. Godshall:

As of the date of this correspondence, Rustick LLC has failed to make the required phased deposits to the surety bonds required for operation of the McKean County Landfill. Failure to make the required deposits is a violation of 25 Pa. Code §271.326(a)(3). The deposits were required to have been made by May 23, 2010, in accordance with the Phased Deposit Endorsements and Schedules for Deposit executed on May 23, 2009.

This Notice of Violation is neither an order nor any other final action of the Department of Environmental Protection. It neither imposes nor waives any enforcement action available to the Department under any of its statutes. If the Department determines that an enforcement action is appropriate, you will be notified of the action.

If you have any questions concerning this matter, please contact me at the above address or telephone number.

Sincerely,

Richard A. Sheriff
Solid Waste Specialist
                          Waste Management Program

**Schedule 2.9**
**Compliance with Laws**

1.  Seller received a Notice of Violation from Pennsylvania Department of Environmental Protection, Warren District Office, dated July 11, 2010 (see Schedule 2.8)

2.  Seller received a Notice of Violation from Pennsylvania Department of Environmental Protection dated July 22, 2010 regarding Chapter 105 Permit No. E42-344 (see Schedule 2.8).

3.  Seller received a Notice of Violation from Pennsylvania Department of Environmental Protection dated January 26m 2009 regarding exceedance of pH limit in NPDES permit-penalty pending as of 04/09 (see Schedule 2.8).

**Schedule 2.10**
**Employment Matters**

1. Employment Agreement with Michael Manderfeld dated June 1, 2008.

2. Seller provides the following benefit plans to employees:

   1. Life insurance through Harleysville Life Insurance Co.

   2. Health & Vision Insurance through Highmark Blue Shield

   3. Dental Insurance through MetLife

   4. Disability Insurance through AFLAC

   5. Rustick LLC 401(k) Plan

**Schedule 2.13**
**Broker**

1.  Sterner Consulting
    19 Waterfront Drive
    Pittsburgh, PA  15222